The appellant was indicted for the first degree murder of his mother. In response to the indictment he entered pleas of not guilty and not guilty by reason of insanity. Defense counsel's pretrial motion for a psychiatric evaluation was granted and the appellant was ordered to a state mental hospital for observation and evaluation. The record is silent as to the recommendations and findings of that hospital, however no contention has been advanced that the appellant was not competent to stand trial. At trial the appellant was found guilty as charged and sentenced to life imprisonment. He is represented by court appointed counsel both at trial and on appeal.
The evidence presented by the state leaves no doubt of the appellant's commission of the murder. Ms. Iola McQueen is a *Page 409 
sister of the appellant. The deceased, Rosa Washington, was the mother of Ms. McQueen and the appellant. She testified that on May 11, 1976, the appellant was living with his mother. About one year before the murder the appellant had suffered a stroke and was not able to work. Ms. McQueen stated that the appellant talked to her over the telephone about "voodoo" and that he refused to eat his mother's food because she put "voodoo" in it. She further testified that the appellant only acted "strange" after he had been drinking and that he did drink "a lot".
Joann Berry lived next door to the appellant and the deceased in the same apartment house. On the morning of the crime she heard several shots coming from the apartment of the deceased. Ms. Berry testified that after she heard these shots, the deceased "came in my door kind of half staggering, and said, he done shot me". She said that "Sam (the appellant) done shot me". Ms. Berry left for a brief period to obtain help and when she returned found the deceased in her bathroom with blood running down her side. The appellant was sitting on the porch with a .22 caliber pistol in his hand and asked if "she" was in Ms. Berry's apartment. Ms. Berry further stated that the appellant had talked to her about voodoo and said that "mama had done fixed him in his throat * * * through cooking". The appellant stopped eating his mother's cooking and would buy "greens and different things" for Ms. Berry to cook for him. According to Ms. Berry, the appellant drank "real heavy" and acted "as normal as she was" when he was not drinking. Although the appellant "didn't act crazy all the time", Ms. Berry "could tell he wasn't just normal".
Officer Robert L. Ingram of the Montgomery Police Department investigated the shooting and found the appellant sitting on the porch to his apartment. When Officer Ingram approached the appellant, he told him that he "shot her and here is the gun". The appellant was given his Miranda rights and again told Officer Ingram that he had shot his mother and intended to shoot another subject if he could find him. An examination of the weapon revealed that although it had been fired a number of times it was fully loaded.
Expert testimony by Dr. Philip Lightfoot, a practicing physician in the city of Montgomery, revealed that the deceased sustained a bullet wound in the abdomen and suffered a great deal of internal bleeding. Dr. Lightfoot testified that the cause of death was complication resulting from surgery necessitated by the bullet wound.
Officer Ingram was recalled and stated that, in talking with the appellant, the appellant did appear confused in some ways but "knew what he was doing and what he had done. . . . He knew what he had done and he said he intended to shoot someone else. And then his reason for it, she was putting things in his food (to try to kill him) and another man had been picking on him."
Detective Kenneth Hitson of the Montgomery Police Department testified that he received a .22 caliber pistol from Officer Ingram and recovered several spent projectiles from the scene of the shooting. Detective Hitson recovered four spent rounds in front of the bushes in front of the house where the appellant was sitting. The appellant also told Detective Hitson that he had shot his mother and that he was looking for another man. The appellant showed him the approximate place he was standing in the house when the shots were fired. Hitson testified that in his opinion the appellant did not know what he was talking about and did not appear to know what was going on at police headquarters.
Following this testimony the state rested. The appellant's motion to exclude was denied. By agreement the appellant's records from Bryce Hospital were submitted as an exhibit.
 I
Initially the appellant argues that it was error for the trial court to allow a state's witness to give hearsay testimony over defense counsel's objection. From the record: *Page 410 
 "Q. After hearing those shots, Mrs. Berry, did you have occasion then to see Mrs. Washington?
 "A. She came in my door kind of half staggering, and said, he done shot me.
"Q. He done shot her?
"A. That is right.
"Q. Did you see who the he was?
"MR. ALLEN: Your Honor, we object to hearsay.
 "MR. PRICE: It is part of the res gestae, Your Honor.
"THE COURT: Overrule the objection.
 "Q. (Mr. Price continuing) Did she tell you who the he was?
"A. We called him Sam. She said, Sam done shot me."
The question objected to did not seek hearsay testimony as any witness may testify to his personal observation. No further objection was made. There being no motion to exclude or strike, no request for a mistrial and no motion for a new trial, no preserved error appears in the record and we have nothing to review. Harris v. State, Ala. App., 347 So.2d 1363, cert. denied, Ala., 347 So.2d 1368 (1977), is controlling on this issue.
 II
The appellant asserts that his motion to exclude the state's evidence was due to be granted because the state presented no evidence to prove or imply that the killing was deliberately or wilfully done.
From the testimony it is reasonable to conclude that the appellant actually intended to shoot the deceased. Intent may be inferred by the jury from the character of the assault, the use of a deadly weapon and other attendant circumstances.Gilmore v. State, Ala.Cr.App., 339 So.2d 116, cert. denied, Ala., 339 So.2d 121 (1976); Brown v. State, 142 Ala. 287,38 So. 268 (1904).
 III
In view of the fact that the appellant told Officer Ingram that he shot his mother and "here is the gun", it was not error for the trial court to admit that weapon, the spent projectiles, and the spent rounds into evidence without objection. Objections to the admission of evidence cannot be made for the first time on appeal. Nichols v. State, 267 Ala. 217, 100 So.2d 750 (1958); Daly v. State, 47 Ala. App. 681,260 So.2d 412 (1972). A motion to exclude will not preserve error in the admission of evidence where no timely objection has been made at the time of its admission. Body v. State, Ala.Cr.App.,341 So.2d 744, cert. denied, Ala., 341 So.2d 748 (1976).
 IV
Finally the appellant contends that it was error for the trial court to overrule defense counsel's objection to the argument of the Deputy District Attorney that there was no evidence to support the defense of insanity. The appellant points out that "it is inconceivable that the Prosecutor would make such a comment when only moments prior, he joined in the introduction of . . ., records subpoenaed from Bryce Hospital".
In closing argument the prosecutor stated:
 "MR. PRICE: Now, as I said to you in my opening statement, the Court will charge you as to what the law is of insanity, or what the law is governing this case. Can we allow John Henry McQueen to just raise that plea, that defense. He has every right to raise it. But to raise it, ladies and gentlemen, without any evidence to support it. There is absolutely no evidence to support John Henry McQueen's defense of not guilty by reason of insanity.
 "MR. ALLEN: Your Honor, I hesitate to object, but there has been evidence presented. And I object to him arguing that no evidence has been presented.
"THE COURT: Overrule the objection."
The record does not reveal whether these comments were made during the state's opening remarks in closing argument or in the state's rebuttal. We note that, if made in the state's initial comments, defense counsel would have had ample opportunity *Page 411 
to refute the comments and dispel any alleged prejudicial effect of the argument.
However, regardless when the comments were made we do not consider them to constitute reversible error. The jury heard the evidence and had the Bryce Hospital records with them during the deliberation. Statements of counsel in argument to the jury must be viewed as in the heat of debate, and such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. Arant v. State, 232 Ala. 275, 167 So. 540 (1936);Beckley v. State, Ala.Cr.App., 335 So.2d 244 (1976).
The prosecutor, as does defense counsel, has a right to present his impressions from the evidence. Carroll v. State,36 Ala. App. 59, 52 So.2d 171 (1951). He may argue every matter of legitimate inference and may examine, collate, shift, and treat the evidence in his own way. White v. State, 41 Ala. App. 54,123 So.2d 179, cert. denied, 271 Ala. 702, 123 So.2d 186
(1960).
We have carefully considered the argument in question. We do not believe that it was so prejudicial to the appellant as to require a reversal. From that portion of the argument in the record we cannot determine if the state was arguing that there was no evidence of insanity or that the evidence presented on the insanity issue was simply insufficient to support the defense. The court in its oral charge to the jury instructed on the issue of insanity. Under the circumstances of this case this was sufficient to cure any harmful effect of the argument.
Having searched the record for error, we are of the opinion that the judgment of the trial court is due to be affirmed.
AFFIRMED.
All Judges concur.