Billy Wayne Duncan was tried by a jury in Jefferson Circuit Court for violation of § 36-39 of the General Code of the City of Birmingham, 1964, as amended, an offense which is commonly referred to as "interfering with a police officer." The appellant was found guilty and was fined $75.00 and costs. In addition, the trial judge sentenced the appellant to thirty days hard labor for the City of Birmingham. The appellant had been charged in Birmingham Municipal Court with interfering with a police officer, disorderly conduct and public drunkenness. He was found guilty of two of these charges. On the charge of public drunkenness he was fined twenty-five dollars and costs, which he paid. On the charge of "interfering with a police officer," he was fined $300.00 and costs and was sentenced to sixty days of hard labor for the City of Birmingham. He appealed the municipal court conviction of "interfering with a police officer" and, from his conviction in the Jefferson Circuit Court, the appellant brings the present appeal.
Ben Barnes, Associate Professor of Electrical Engineering at Auburn University, stated that, on December 2, 1978, he attended the Auburn-Alabama football game. Following the game, Barnes, who was dressed in an orange jacket and a blue cap, started walking down Greymont Avenue toward his parked car. Barnes noticed that the appellant and his brother were walking ahead and shouting, "Go to hell War Eagle," at people across the street as they were leaving the stadium. According to Barnes, as he started across the side street, *Page 1234 
he encountered the appellant's brother. At that time, the appellant's brother shoved Barnes in the chest, and Barnes fell backwards three or four steps. Barnes acknowledged that at no time did he make any direct comments to, or "physical motions" toward, the appellant's brother.
According to Barnes, a Birmingham police officer appeared, grabbed the appellant's brother, pinned his arms behind his back, and told him he was under arrest. Barnes recalled that the appellant's brother struggled to free himself and, in that struggle, he and the police officer fell to the ground. Further, Barnes stated that, after the appellant attempted to persuade the police officer to release the brother, the appellant struck the officer. Also, Barnes stated that, during the struggle, the police officer struck the appellant in the mouth. Barnes testified that he had observed many intoxicated people in the past and that, in his opinion, the appellant and his brother were intoxicated at the time of the incident.
Birmingham Police Officer Thomas Fields testified that, on December 2, 1978, he was directing traffic following the Auburn-Alabama football game. Fields stated that he had observed the appellant's brother having words with a man in an orange coat in the middle of the intersection. Fields said that he observed that, the appellant had "grabbed hold" of his brother and that the brother then jerked away from the appellant.
According to Fields, he then went over to the appellant's brother, MacArthur Duncan, grabbed his arm, and began to lead him away from the difficulty when he jerked away. Fields then grabbed Duncan's arm again and informed him that he was under arrest. Fields recalled that, as he started to lead the appellant's brother away, the appellant grabbed Fields from behind. At that time, Fields released the appellant's brother and grabbed the appellant. Fields remembered that he was hit in the back of the head "and everything went black." According to Fields, the next thing he remembered was that he had MacArthur Duncan on the ground and was using a night stick on his chest to hold him. The appellant grabbed Fields' arm and attempted to pull him away from MacArthur Duncan.
Officer Fields testified that he did not strike either the appellant or his brother at any time during the struggle. Also, Fields said that, when other officers arrived in the area, he handcuffed MacArthur Duncan while the other officers handcuffed the appellant. Fields stated that the appellant and his brother were calling the officers "m-f's and s-o-b's." Fields said that, in his opinion, the appellant and his brother were intoxicated on that occasion. Fields stated that on Monday following the incident, he went to the emergency room at University Hospital and received medical attention.
Curry Ward testified that he witnessed the incident between Barnes, the appellant, Duncan, and Fields. Ward's testimony substantially corroborated that of Fields and Barnes. According to Ward, when Officer Fields informed MacArthur Duncan that he was under arrest, Ward heard Duncan say, "I haven't done anything. You're not going to arrest me." At that time, MacArthur Duncan attempted to escape, Officer Fields pursued him and, according to the witness, "Got him down on the ground, trying to arrest him." Ward said the appellant got on top of the officer and struck two blows on the back of his head. Ward recalled that he and several others intervened and pulled the appellant off the officer. Immediately after Ward and the others had intervened, a black female officer appeared and was told to place the larger of the two men under arrest. The appellant said, "There's no black bitch going to arrest me." At that point, the female officer called for assistance and, subsequently, a number of police officers arrived and assumed control of the situation.
Ward stated that there were a large number of spectators at the time of the incident and that he did not see the officer strike either the appellant or his brother. Ward testified that, in his opinion, the appellant and his brother were intoxicated at the time of the incident. *Page 1235 
Richard Callahan testified that, on December 2, 1978, he was walking down Greymont Avenue with two other men when they came upon a disturbance. According to Callahan, he could see a police officer attempting to arrest a man, whom he identified in court as MacArthur Duncan. Callahan stated that, while officers had custody of Duncan, the appellant was striking and shoving a police officer about his head. Subsequently, another officer arrived and took custody of the appellant. Callahan heard the appellant say that he had "not done anything" and did not deserve to be arrested. Further, the witness said that the appellant was cursing the officers at the time. Callahan did not see the police officers strike the appellant or his brother.
Kenneth Barclay testified that, following the Auburn-Alabama game on December 2, 1978, he and his wife came upon a police officer talking with a man whom the officer held by the arm. According to Barclay, he identified the man in custody as MacArthur Duncan. Further, the witness stated that Duncan escaped from the police officer and ran. At that point, the officer ran after Duncan and caught him. Barclay recalled that he saw the appellant strike the officer in the back of the head. Barclay and others positioned themselves between the appellant and the officer who was subduing the appellant's brother.
Mitchell Alverson, who had accompanied Callahan, gave testimony which was substantially the same as that of Callahan and the other witnesses. Alverson, on cross-examination, stated that he saw the appellant approach the officer from behind, but he did not see the appellant strike the officer. However, Alverson did say, "There was pushing."
Officer R.H. Landers was also directing traffic along Greymont Avenue and Sixth Street and observed a large crowd of people around Officer Fields. He was attempting to handcuff a man on the ground, while another man was on Officer Fields' back. Landers identified the man Fields was attempting to handcuff as the appellant's brother and the man on Fields' back during the struggle as the appellant. Landers stated that he pulled the appellant from the officer's back, took him over to a car, and handcuffed him. According to Landers, both the appellant and his brother were using loud, obscene language during the incident, and, in Lander's opinion, both were intoxicated.
Donald Champion testified that as he and his wife were leaving the football stadium, he saw two people scuffling with a police officer. According to Champion, the police officer regained custody of the smaller man who attempted to escape while the officer was trying to handcuff him. Champion said the larger man, whom he identified in court as the appellant, pulled the officer's hair and struck him on the head from behind. Champion stated that, at that time, he along with some others left the scene to find another police officer to assist the officer involved in the scuffle. Finding another policeman, Champion returned to the scene with the other officer, who assisted Fields in making the arrest. Following the testimony of Champion, the City rested its case, and the appellant, outside the presence of the jury, moved to exclude the City's evidence on the ground that a prima facie case had not been proved. The motion was overruled, and the defense presented its case.
John Wesley Duncan, brother of the appellant and MacArthur Duncan, testified that, after the football game on December 2, 1978, he noticed his brother, MacArthur, having difficulty with a bearded man. The witness saw the man wrestle MacArthur to the ground from behind and saw Officer Fields attempt to separate the two men. Duncan stated that, as his brother was attempting to get up from the ground, Fields hit MacArthur in the face twice with a nightstick. The witness stated that the force of the blow knocked his brother to the ground and caused his face to bleed. According to Duncan, at that point, the appellant intervened on behalf of MacArthur. Duncan stated that the appellant asked Fields why he hit MacArthur and the officer then turned and hit the appellant with *Page 1236 
the nightstick. Duncan testified that, as Fields began to handcuff MacArthur, another police officer approached and handcuffed the appellant. Duncan testified that neither of his brothers struck Officer Fields at any time.
During cross-examination, Duncan admitted that he and his brothers had had one mixed drink each. Also, he denied that he or his brothers had used any profanity during the incident. Further, he stated that neither of his brothers struggled, fought, nor hit the officer.
MacArthur Duncan's account of the incident was substantially the same as that of his brother, John. The witness reiterated the fact that he was accosted from behind and thrown to the ground by a "big guy." According to Duncan, when he got up, he was hit by Officer Fields with a nightstick and knocked to the ground. Fields, according to Duncan, then got on top of him, placed one knee in his stomach and the other on his throat, and, simultaneously, swung the nightstick at his head. Duncan stated that his brother, the appellant, walked over and asked the officer why he was arresting the witness, and the officer turned and hit the appellant twice with the nightstick. According to MacArthur Duncan, Fields said, "If you don't stand there I'm going to knock hell out of you again." At that time, other officers arrived and arrested the three brothers. The three were taken to Legion Field to a "lock-up." Duncan said that, shortly afterwards, they were taken to the hospital for examination.
MacArthur Duncan denied that he, or the appellant made any racial slurs toward anyone, nor did they use any profanity during the incident. Further, he also denied that he or his brother had struggled or hit the police officer.
The appellant's testimony concerning the incident was substantially the same as that of his two brothers. The appellant denied that he or his brother used any profanity or that they struggled with the police officer. The witness denied hitting the officer or interfering in any way with Officer Fields during the time he was attempting to arrest MacArthur Duncan.
At the end of appellant's testimony, the defense rested, and the City of Birmingham called Officer Fields in rebuttal. He testified that his uniform was torn and his badge was ripped from his shirt during the struggle with the appellant.
Fields stated that, when a person being arrested has been seriously injured, standard procedure is to immediately take the injured person to the hospital, otherwise the arrest reports are made out prior to any transfer to the hospital. During cross-examination, the officer acknowledged that he escorted the appellant and MacArthur Duncan directly to the jail rather than to the hospital. Further, the witness acknowledged that he had conferred with an attorney about suing the defendants. At the end of Officer Fields' rebuttal testimony, the case was submitted to the jury for their consideration.
 I
The appellant complains that the trial court erred when it refused to give certain requested charges. We have carefully reviewed and examined approximately forty-four charges which were refused to the appellant and have found that they were substantially and fairly covered in the court's general charge. Therefore, the refusal is not error. § 12-16-13, Code of Alabama 1975; Mains v. State, Ala.Cr.App., 375 So.2d 1299.
 II
The appellant complains that the trial court committed reversible error when it incorrectly administered the oath to the jurors. He argues that the following oath given to the jurors did not comply with § 12-16-170, Code of Alabama 1975.
From the record:
 "THE COURT: Y'all please stand and raise your right hand.
 "Do each of you solemnly promise that you will well and truly try the issues joined between the City of Birmingham and MacArthur and Billy Wayne Duncan *Page 1237 
and render a true verdict according to the evidence, so help you God. If you do, say I do.
"(Whereupon, the jury answered in the affirmative.)
 "MR. LAIR: Your Honor, can I take exception to the swearing of the jury?
 "THE COURT: Could you, for the record, tell what's wrong with it? I might even correct it, if you tell me what the problem is?
 "MR. LAIR: My recollection is it doesn't — I could be wrong, I probably am. My recollection is I don't believe it follows the code.
"THE COURT: Overruled.
"MR. LAIR: We except."
This court in Goolsby v. State, 17 Ala. App. 545, 86 So. 137, stated:
"An oath is defined to be:
 "`A solemn adjuration to God to punish the affiant if he swears falsely. The sanction of the oath is a belief that the Supreme Being will punish falsehood; and whether that punishment is administered by remorse of conscience or in any other mode in this world, or is reserved for the future state of being, cannot affect that question, as the sum of the matter is a belief that God is the avenger of falsehood.' Beeson v. Moore, 132 Ala. 391, 31 So. 456; B.R., L. P. Co. v. Jung, 161 Ala. 461, 478, 49 So. 434, 18 Ann.Cas. 557.
 "In other Words and Phrases, p. 4871, is found the further definition.
 "`An oath is a declaration or promise made by calling on God to witness what is said. * * * An oath is defined to be an outward pledge, given by the person taking it, that his attestation or promise is made under an immediate sense of his responsibility to God. * * * The term "oath," in its broadest sense, includes all forms of attestation by which a party signifies that he is bound in conscience to perform an act faithfully and truthfully, and that the person who takes it imprecates the vengeance of God upon him if the oath taken is false.'"
As can be seen from the above quoted portion of the record, the trial judge administering the oath to the jury substituted the word "promise" for the words "swear and affirm." However, the significant portion of the oath, that is "the sanction that the Supreme Being will punish falsehood," was present. We find this in the court's admonishing words, "and render a true verdict according to the evidence, so help you God . . ."
[Emphasis added.] In our judgment, it is clear that the jurors had to be aware they were making a pledge to "well and truly try" the issues adjoined between the City of Birmingham and the appellant. Further, there was an imprecation that the vengeance of God would come down upon those who made a false oath.
In the present case, we believe that the court's use of "promise" instead of "swear and affirm" did not render the oath ineffective, causing reversible error. The necessary elements, including calling upon the deity to witness what the individual juror says, are present. Also, as required by the trial judge, all jurors stood and raised their right hands when making their oath, and all answered in the affirmative. Consequently, the trial court's substitution of the word "promise" did not constitute reversible error.
 III
The appellant insists that the trial court committed reversible error when it sustained the City of Birmingham's objection to the following question by the defense:
 "Q. How much are you going to sue for, Officer Fields?
"MS. CROCKER: Objection. Irrelevant and immaterial.
"THE COURT: He hasn't filed it yet. How does he know?
 "Q. Have you discussed an amount that you were going to sue for?
"MS. CROCKER: Object.
"THE COURT: Sustain.
"MR. LAIR: We except."
This court in Maund v. State, Ala.Cr.App., 361 So.2d 1144, restated the rule that *Page 1238 
it is a discretionary matter with the trial judge as to what limitations are to be placed when questioning a witness concerning his pecuniary interests in the outcome of a trial. There, the court said:
 "`It is the law, of course, that the pecuniary interest a witness may have in the outcome of a trial is a proper subject of inquiry for the purpose of questioning the credibility of a witness. However, there must be a limit to which such questioning extends and that limitation is placed within the sound discretion of the trial court and rulings on such limitations will not be revised by this court unless there has been a clear abuse of discretion. Smith v. State, 30 Ala. App. 346, 5 So.2d 648; Broadway v. State, 35 Ala. App. 86, 45 So.2d 480.'"
The record in the present case indicates that the trial judge afforded the appellant great latitude in pursuing the pecuniary interest of the officer. The appellant was permitted to elicit from the officer the fact that he had talked to an attorney concerning a suit against the appellant, that the officer was contemplating filing a suit for damages, and the fact that he would be asking for money in the event of a suit. Under these circumstances, we do not believe that the limitation placed upon the appellant was improper, nor do we believe that the trial court abused its discretion.
 IV
The appellant asserts that the trial court committed reversible error when it allowed Officer Fields to testify concerning the standard operating procedure of the Birmingham Police Department as to when an injured suspect should be taken to the hospital. According to the appellant, the court also erred when it allowed Officer Fields to testify as to why he waited until the Monday following the incident to seek medical attention for an injury which allegedly occurred as a result of the incident. Regarding the first assertion, the record clearly reflects that Officer Fields had been a policeman for the City of Birmingham for some eight years and would be competent to testify as to the standard operating procedures concerning the hospitalization of injured suspects.
As to the second assertion, we believe that it in no way, prejudices the substantial rights of the defendant. If error was present, it was harmless. Rule 45, A.R.A.P.
 V
The appellant argues that the trial court erred when it did not allow him to have his plea of former jeopardy heard by the jury.
We have reviewed the evidence presented on the plea and have found that the trial judge, in making his ruling, stated that the plea presented only a question of law for the court to determine and did not present a factual issue for the jury's determination.
The appellant's plea of former jeopardy, omitting the formal parts, reads as follows: "
"Comes now the Defendant and for plea says:
 "He has once been in jeopardy for the offense of which he is now charged in this Complaint, and that on the, to-wit: 17 day of January, 1979 the Defendant was by the Recorder's Court of the City of Birmingham found not Guilty of Disorderly Conduct and Guilty of Public Drunk and fined Twenty-five Dollars and Court Costs. Defendant did on said occasion pay the said fine and costs in full. Defendant avers that the present charge of Interfering with Officers in this instance was included in and adjudicated by the said Recorder's Court on to-wit: January 17, 1979 and that Defendant was thus in jeopardy.
 "Defendant avers that the events, acts, allegations, facts, circumstances, setting, date, time and place upon which are based the present Complaint, are the same events, allegations, facts, acts, circumstances, setting, date, time and place upon which defendant was previously tried on the said charges of disorderly conduct and public drunk and that defendant was thus in jeopardy." *Page 1239 
Although the general rule is that an accused is entitled to have a jury hear issues of fact raised by a plea of former jeopardy, it is also the rule that, where the issue presented by the plea is a matter of law, then the issue need not be submitted to the jury for their consideration. Billups v. Cityof Birmingham, Ala.Cr.App., 367 So.2d 518. The circumstances of the particular case will determine whether a question of fact or a question of law is at issue. In the present case, we have reviewed the transcript of evidence concerning the hearing on the plea of former jeopardy, and it is our judgment that no issues of fact were presented.
As can be seen from the appellant's plea of former jeopardy, the contention that the appellant was improperly charged with two offenses arising out of the same set of facts is made. The Alabama Supreme Court enunciated the rule regarding a plea of former jeopardy in Racine v. State, 291 Ala. 684,286 So.2d 896. There the court stated:
 "A plea of former jeopardy is unavailing unless the offense presently charged is precisely the same in law and fact as the former one relied on under the plea. And this is true even if both cases are founded on the same facts but the crimes charged were not the same in law."
See also, Colston v. State, Ala., 350 So.2d 337.
Therefore, it is our judgment that the court was correct in overruling the plea of former jeopardy without intervention of a jury.
 VI
The appellant avers that the trial court committed reversible error when it permitted the City, in closing argument, to comment, "My client is all of you and all of these people out there."
We have reviewed that portion of the record involving this comment and find:
 "MS. CROCKER: My client is all of you and all of these people out there.
"MR. LAIR: I object.
 "THE COURT: Sustain, as to the statement `all of you.' You're not involved as clients in this case. You're the jury. "As regards the people out there, I'll overrule."
From the foregoing portion of the record, we find that the defense's objection was sustained and that the trial judge made the necessary curative instructions. If any prejudice was created by the prosecution's remarks it was eradicated by the trial court's prompt action; therefore, we find no error.
 VII
The appellant also complains that, during closing argument, the prosecution, referring to the officer's injury, remarked, "He was injured to the point that he had a concussion." Although there was no specific evidence concerning the term "concussion," there was testimony by Officer Fields that, after he received the blow to his head, he blacked out.
The law in Alabama is clear that, when arguing a case to a jury, counsel is allowed great latitude in drawing reasonable inferences. McQueen v. State, Ala.Cr.App., 355 So.2d 407; Henryv. State, Ala.Cr.App., 355 So.2d 411; Hurst v. State, Ala.Cr.App., 356 So.2d 1224.
Under the facts presented, it is our judgment that no error was shown.
 VIII
The appellant urges that the trial court's failure to grant his motion for a mistrial after the prosecution had made the comment complained of in VI was error.
The statutory authority for granting a mistrial is found in §12-16-233, Code of Alabama 1975, which reads as follows:
 "The court or presiding judge in all cases of jury trial may discharge the jury without giving a verdict, with the consent of all parties to the trial or without the consent of the parties, when, in the opinion of the court or judge, there is a manifest necessity for the discharge or *Page 1240 
when the ends of justice would otherwise be defeated. In all cases in which the jury is discharged without a verdict, a mistrial shall be entered upon the minutes of the court, assigning the reason or cause for the mistrial, and no person shall gain any advantage by reason of such discharge of the jury. (Code 1907, § 7314; Code 1928, § 8696; Code 1940, T. 30, § 100.)"
This section clearly states the reason for discharging a jury when declaring a mistrial. The section also states that the trial judge has discretion in determining whether any reason for discharging the jury exists. Andrews v. State, 174 Ala. 11,56 So. 998; Willingham v. State, 50 Ala. App. 363,279 So.2d 534.
Discharging a jury on a motion for a mistrial is an extreme measure, and leaving this choice to the trial court's discretion is proper because he heard what transpired and has seen the scenario unfold. He is in a far better position to determine whether a jury should be discharged and a mistrial granted. Hurt v. State, Ala.Cr.App., 361 So.2d 1163. See also,Carroll v. State, 45 Ala. App. 92, 225 So.2d 198.
We have examined the record and transcript of evidence and have found no error prejudicial to this appellant. Therefore, the judgment of conviction by the Jefferson Circuit Court is affirmed.
AFFIRMED.
All the Judges concur.