Murder; sentence: life imprisonment.
The State's evidence was sufficient to prove beyond any reasonable doubt that the appellant intentionally killed Cornelia Eddy at her place of employment in Jasper, Alabama, by shooting her with a pistol on the evening of February 26, 1980. Viewing the evidence in the light most favorable to the State, as this court is required, Curtis Williams testified that he first saw appellant on the date in question around 10:30 or 11:00 a.m. at appellant's house. Later, around noon, Joe Lee Guyton came to appellant's house. Williams overheard appellant ask Guyton for a gun. Appellant told Williams and Guyton that he owed the "dope man" $500 and that the "dope man" was coming by later to collect his money. Appellant needed the gun to kill the "dope man." Guyton told appellant his mother had a gun, but he "didn't want to get his mother involved." Williams stated that appellant already had a pistol of his own at the time he asked Guyton for one.
Williams next saw appellant around 5:30 or 6:00 p.m. in front of Ethel Brown's house. At this time appellant asked Williams *Page 153 
if he would "get hold of a gun." Williams told him no. An argument later ensued between Williams and a man named Houston. Williams borrowed appellant's .22 pistol, Williams and Houston quit arguing, and Williams reentered Brown's house and returned appellant's pistol. Williams then left Brown's house and started toward Melvin Collins's house when appellant stopped him. It was approximately 7:00 p.m.
Appellant resumed the conversation with Williams that he owed the "dope man" $500 and he "had to get some money." Williams testified that appellant "asked me to go down to the store with him to rob Handy Dandy, and I told him I didn't have the nerve." Appellant again asked Williams if he could get a gun and Williams said no. Appellant then told Williams "not to worry about it but come go with him." Williams testified that he and appellant "went on down, and as we went down he instructed me what to do and how to do." Williams admitted his voluntary participation in the robbery throughout his testimony.[1]
When appellant and Williams arrived at the Handy Dandy convenience store, appellant told Williams "to be the lead man, to go in and check the place out and see who all was in there and come back out and let him know about it." While appellant hid behind a dumpster-type garbage can near the store, Williams stood outside the store "for a few minutes and then went inside." Williams bought a pastry and a soft drink and proceeded to leave when he saw Vera "Cookie" Shelton entering the store. "She was coming in the door when I come out. . . . She spoke and I spoke and I headed toward where Barry was [still behind the dumpster] until he told me to keep going." After Miss Shelton left the Handy Dandy, Williams returned to the dumpster and told appellant that "the store was clear."
Williams testified that he and appellant then entered the store together. "There was nobody in there but me and him and the girl." Williams stated that he heard appellant order an ice cream cone while he (Williams) went to the back of the store "to the drink box." Williams stated that as he picked up a can of soda he "heard a gun go off, a `pow' sound." He also heard the deceased make "a small squeak, a little holler." Williams testified that he turned around instantaneously and saw appellant behind the cash register. "He had the cash drawer in his hand, and he told me to come on and let's go. I started running and I came to the cash register and looked behind there. She was behind there; I saw blood and I started running behind." Williams also saw appellant leap over the sales counter, knocking over a rack of cigarettes while holding the cash drawer in his hands. No other eyewitness besides Williams could positively place appellant at the scene of the crime.
Williams and appellant ran in opposite directions when they left the Handy Dandy, but met a short time later at Ethel Brown's house. Appellant gave Williams some of the money taken in the robbery and told him to keep his "mouth shut." Appellant had his .22 pistol in his trousers. While Williams did not actually see appellant fire the weapon, he knew appellant had the pistol both before and after the murder. Williams identified the murder weapon and stated the following: "To the best of my recollection that is the only gun Barry took around. That is the only gun I have ever seen Barry carry around."
Williams stated that he next went over to Mrs. Janie Clopton's house, bought a beer, and paid Vera "Cookie" Shelton for some beer he had purchased earlier on credit. Mrs. Clopton, Vera Shelton's mother, was a bootlegger. Williams left Mrs. Clopton's house and later returned to order more beer before going home. *Page 154 
Williams testified that the next time he saw appellant was on March 7, 1980, at the city jail in Jasper. Williams stated that his cell was separated from appellant's and that another cell was occupied by an inmate, Steve Daniel. Williams admitted that he and appellant had a conversation about the robbery/murder while they were in their respective cells. "We hollered back and forth to each other." Williams testified that the gist of their conversation was appellant telling him "to take the rap and say I killed the girl and tell the police I had lied, to free him and if I don't do it that I wouldn't make it to prison." Williams stated that appellant also offered to help him if he would take the "rap" and talked about "where the gun was." Their conversation was in "pig Latin" as well as in English. Williams refused to acquiesce to appellant's proposals and demands.
 I
Appellant contends that he was unlawfully convicted on the uncorroborated testimony of Williams, an accomplice. We disagree. Williams' testimony was sufficiently corroborated by other evidence tending to connect appellant with the commission of the offense. Ala. Code § 12-21-222 (1975).
The State concedes, and we find, that as a matter of law Williams was an accomplice. He freely admitted throughout his testimony that he had voluntarily participated in the armed robbery of the Handy Dandy convenience store which led to the murder of the deceased. Yarber v. State [6 Div. 351, Ms. October 27, 1981] (Ala.Cr.App. 1981); Yarber v. State,375 So.2d 1229 (Ala. 1978). The State's evidence undisputedly makes Williams an accomplice. Yarber, 375 So.2d at 1230; Jacks v.State, 364 So.2d 397 (Ala.Cr.App.), cert. denied, 364 So.2d 406
(Ala. 1978). Williams knew that appellant was armed with a pistol when the two entered the Handy Dandy and that appellant was desperate to get $500 to pay the "dope man." While Williams's personal motive for participating in the crime is not so evident, there is no doubt that he willingly participated and voluntarily gave the necessary aid and assistance, whether on his own initiative or at appellant's suggestion, to insure the success of the venture. There was no testimony by Williams, as by Miles in Yarber v. State, 375 So.2d at 1230, trying to "pin the offense" or "put all the blame" on appellant. There was no testimony by Williams, as by the witness in White v. State, 352 So.2d 29 (Ala.Cr.App. 1977), that he "left the scene" just prior to the robbery. Further, based on all the facts and circumstances, it cannot be seriously questioned that Williams had knowledge that appellant intended to take murderous action, if necessary, to succeed in their robbery scheme. As was stated in Jacks, supra: "Thus a participant in an illegal venture for one purpose becomes one for all where the additional crimes are the proximate, natural, and logical result of the adventure upon which the actors engaged with a common purpose." 364 So.2d at 402-403. While application of this principle is limited, as this court points out in Jacks, we believe that it has application in the instant case.
Having determined that Williams was an accomplice as a matter of law, we find the following evidence corroborative of his testimony and tending to connect appellant with the commission of the crime.
(1) Joe Lee Guyton, in addition to confirming Williams's testimony that appellant had asked him (Guyton) if he had a gun on the morning of the robbery/murder, testified that he saw appellant at Ethel Brown's house around 8:00 p.m. that night. Guyton stated that appellant called him upstairs and "said he had let Curtis (Williams) use his gun, and he thought Curtis had shot somebody with it and he asked me to smell of it." Appellant put the pistol "back in his pocket" after Guyton had examined it. Guyton identified State's Exhibit No. 10 as appellant's .22 pistol. This was the same pistol that Williams testified appellant used in the robbery/murder. Three days later appellant told Guyton he was going to talk to the district attorney about Williams. After this conversation with the district attorney took place, appellant informed *Page 155 
Guyton that "he had told the D.A. that the dude dropped the gun off by the swimming pool." Guyton testified that the appellant immediately returned to his house and "said he had to get the gun out of the premises." Guyton saw appellant retrieve his pistol from a box under some clothes on his back porch and wrap it in a blue towel. Guyton then went with appellant to the swimming pool near the Carver Court Apartments and saw him drop the pistol, still wrapped in the towel, into a hole in the woods nearby. On March 10, 1980, Guyton led Detective Charles Fleming of the Jasper Police Department to the hole and the pistol was recovered.
(2) When Lawden Yates of the Department of Forensic Sciences compared the bullet recovered from the deceased with appellant's pistol (State's Exhibit No. 10), he could not state for certain that appellant's pistol was the murder weapon because of the amount of rust that had collected in the barrel. However, he found the class characteristic between the recovered projectile and appellant's pistol to be consistent. Yates stated with certainty that the bullet had been fired out of a barrel manufactured by R.G. Industries. Appellant's pistol barrel was manufactured by R.G. Industries.
(3) Steve Daniel testified that he was in the Jasper city jail with appellant and Williams on March 8, 1980. Daniel stated that appellant's cell was between his cell and Williams's cell. During the course of the evening, Daniel heard appellant talk to Williams "about the rap for the crime." Daniel heard appellant tell Williams that "if he would take the rap for whatever they had done he would pay him and get him a lawyer and get him out on bond." (Emphasis added.) Williams told appellant "he was crazy." Daniel also heard appellant tell Williams that "they needed to get rid of some things and cover up." (Emphasis added.) When appellant told Williams about hiding the gun, Williams responded, "I think you better leave it alone." Daniel stated that appellant's language was interspersed with "pig Latin and regular English." Daniel stated that Williams "had started talking about the crime itself. . . . He was talking about when he was at this building, which was the Handy Dandy, that when he went to get a coke that he heard something go off and it scared him."
(4) Mrs. Janie Clopton and Miss Vera Shelton both verified that they had seen Williams at the Handy Dandy around 7:00 p.m. on February 26, 1980, prior to the robbery/murder. Mrs. Clopton stated that Williams "was acting suspicious," that he hesitated outside the store "like he was going to the garbage or some kind of building." Mrs. Clopton stated that she and her daughter left the Handy Dandy about fifteen minutes later. Mrs. Clopton's house was a three-minute drive from Handy Dandy. Williams came to her house a little past 7:30 p.m. and "gave Cookie some money." Appellant then came to Mrs. Clopton's house and asked if she had seen Williams and how long it had been since Williams left.
Corroborative evidence need not be strong or sufficient of itself to support a conviction, the criterion being that it legitimately tends to connect the accused with the offense.Andrews v. State, 370 So.2d 320 (Ala.Cr.App.), cert. denied,370 So.2d 323 (Ala. 1979). Both circumstantial and direct evidence are competent to connect the defendant independently with the crime about which the accomplice has testified. Yarberv. State [6 Div. 351, Ms. October 27, 1981] (Ala.Cr.App. 1981). Our supreme court stated the following in Dolvin v. State,391 So.2d 133, 137 (Ala. 1980), quoting from White v. State,294 Ala. 265, 314 So.2d 857, cert. denied, 423 U.S. 951,96 S.Ct. 373, 46 L.Ed.2d 288 (1975):
 "`Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty. Lowe v. State, 90 Fla. 255, 105 So. 829 (1925). Circumstantial evidence is said to be the inference of a fact in issue which follows as a natural consequence according to reason and common experience from known collateral facts. Lowe, supra.'" *Page 156 
As this court stated in Jacks v. State, 364 So.2d at 404-405:
 "The corroborative evidence need not refer to particular statements testified to by the accomplice. Skumro v. State, 234 Ala. 4, 170 So. 776 (1936); Malachi v. State, 89 Ala. 134, 8 So. 104 (1889). "`It is not necessary that the corroborating evidence refer to any particular statement or fact testified to by the accomplice. If it strengthens the probative criminating force of his testimony and tends to connect the defendant with the commission of the offense it is sufficient to warrant the submission of the issue of guilt or innocence to the jury.' Smith v. State, 230 Ala. 413, 416, 161 So. 538, 542 (1935).
. . . .
 "Additionally, sufficient corroboration of the testimony of an accomplice may be furnished by a tacit admission by the accused, by the suspicious conduct of the accused, and the association of the accused with the accomplice, or by the defendant's proximity and opportunity to commit the crime. Cheatwood v. State, 22 Ala. App. 165, 113 So. 482, cert. denied, 216 Ala. 692, 113 So. 915 (1927); 23 C.J.S. Criminal Law § 812 (4).
 "`In determining the sufficiency of corroborative evidence testimony the entire conduct of an accused within reasonable time limits of the date of the offense may be examined.' Fuller v. State, 34 Ala. App. 211, 215, 39 So.2d 24, 27, 252 Ala. 20, 39 So.2d 29 (1949). An accused's consciousness of guilt as shown by the evidence may be corroborative. Fuller, 34 Ala. App. 215, 39 So.2d 24."
Although evidence of motive alone is not sufficient corroboration, Sorrell v. State, 249 Ala. 292, 31 So.2d 82
(1947), it may be considered in connection with other evidence tending to connect the accused with the crime. Slayton v.State, 27 Ala. App. 422, 173 So. 632, rev'd on other grounds,234 Ala. 1, 173 So.2d 642 (1937). Moreover, voluntary statements by the accused may constitute sufficient corroboration of an accomplice to authorize a conviction.Snoddy v. State, 75 Ala. 23 (1883); Williams v. State,52 Ala. App. 406, 293 So.2d 324 (1974).
Applying the foregoing principles to the facts before us, we have no difficulty in finding that the incriminating testimony of Williams was sufficiently corroborated.
 II
We have carefully examined the admission of the bloody fingerprint discovered on the sales counter of the Handy Dandy in light of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194,10 L.Ed.2d 215 (1963), and United States v. Agurs, 427 U.S. 97,96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and do not find that the principles enunciated in those cases were violated. The comparison conducted by fingerprint expert James A. Howell of the Jefferson County Sheriff's Department of the bloody fingerprint with appellant's known fingerprints was not exculpatory of appellant's guilt. At most, Howell's comparison was inconclusive as to appellant's guilt. It is true that Howell testified that he could not identify the bloody fingerprint as belonging to appellant; however, his inability to make an identification was because the bloody fingerprint had been smeared leaving only three identifiable points matching appellant's known prints. Howell testified that the least number points of identification he could use to make a positive identification comparing a known print to a latent print was seven. Howell was able to determine with certainty that the bloody fingerprint did not belong to Williams, the deceased and certain medical technicians who arrived on the scene shortly after the robbery/murder. This was so because none of the identification points on the bloody fingerprint matched their known prints.
In addition, the State presented evidence through Investigator John Vaughn, of the Walker County Office of the District Attorney, that defense counsel Eddie Jackson had, in fact, been informed of Howell's findings. Vaughn testified that Howell told him that he had found two or three points of similarity between the fingerprints in question, but that he would not *Page 157 
make a positive identification "with less than seven points." Vaughn stated that he "related to Mr. Jackson" this information. We hold that the trial court's ruling admitting Howell's testimony was without error.
 III
Appellant contends that the State argued facts which were not facts pertaining to the bloody fingerprint in its closing argument. There is no need to here set out those portions of the State's argument because the trial court sustained appellant's objections and also instructed the jury to "disregard that line of argument" thus curing any error. May v.State, 42 Ala. App. 401, 166 So.2d 860, cert. denied, 277 Ala. 700, 166 So.2d 865 (1963).
It should further be pointed out that statements of counsel in argument to the jury must be viewed as in the heat of debate, and such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. Arant v. State, 232 Ala. 275,167 So. 540 (1936); Hayes v. State, 395 So.2d 127 (Ala.Cr.App.), cert.denied, 395 So.2d 150 (Ala. 1981). The prosecutor has, as does defense counsel, a right to present his impressions from the evidence. McQueen v. State, 355 So.2d 407 (Ala.Cr.App. 1978). He may argue every matter of legitimate inference and may examine, collate, sift, and treat the evidence in his own way.Hayes, supra; McQueen, supra. We therefore find no error in this regard.
AFFIRMED.
All the Judges concur.
[1] At the time Williams offered his testimony in this cause he had pleaded guilty to robbery of the Handy Dandy and was serving a twenty-year sentence. An indictment against Williams for murder arising out of the same transaction was still pending. Williams, though at all times admitting his complicity in the crime, insisted that it was the appellant who pulled the trigger killing the deceased.