TYSON, Judge.
The indictment charged Raymond Gilmore with the unlawful assault with intent to murder one Clifton Lawson. The jury found the appellant “guilty as charged,” and the trial court then entered judgment setting sentence at five years imprisonment in the penitentiary. The appellant filed a motion for new trial which, following a hearing thereon, was denied (R. 149, 154, 162).
The event giving rise to this indictment took place during the early morning hours of September 28, 1975, at the residence of Olean Hicks, which is located on Point A Road in Covington County.
Deputy Sheriff Howard Easley testified he received a call from the Andalusia Police Department around 1:10 a. m. and was informed that a shooting had taken place in the Point A community at the home of Olean Hicks. Deputy Easley stated that he arrived at the Hicks’ home around 1:30 a. m. almost simultaneously with the rescue squad and was requested by them to enter the home first to insure that all shooting had ceased. Deputy Easley testified he entered the front door which led him into a bedroom where he found Olean Hicks and Jeanette Lawson “trying to quiet the children.” Deputy Easley stated that as you enter the front door of the house (into the front bedroom), there is a door to the immediate left which leads into the living room where he observed the victim of the assault, Clifton Lawson, lying on the floor in a “pool of blood” near the back wall. He testified that he then motioned for the rescue squad to enter, and they placed the victim on a stretcher and put him in the ambulance. Deputy Easley stated he observed no weapon near the victim’s body, and that the appellant was not present in the home at that time. He stated that he questioned Olean Hicks and Jeanette Lawson about the shooting, and that he, Jeanette Lawson, and Deputy Jim Stallings who had subsequently arrived on the scene, drove over to the appellant’s home and arrested the appellant. Deputy Easley testified that when they entered the appellant’s bedroom, he pointed to the corner where they found a twelve gauge double barrel shotgun lying behind a dresser. He stated that they took the gun and the appellant in custody and proceeded to the Sheriff’s Department after advising the appellant of his Miranda rights.
Deputy Jim Stallings, also of the Coving-ton County Sheriff’s Department, testified that upon his arrival at the Hicks’ home, he, too, observed the body of the victim and stated that Clifton Lawson had been shot in the thigh area of the right leg which left “quite a bit” of blood on the living room floor. Deputy Stallings testified that he, Deputy Easley, and Jeanette Lawson drove over to the appellant’s home and placed the appellant under arrest. He further stated that they did not place Jeanette Lawson (the appellant’s daughter and wife of the assaulted victim, Clifton Lawson) under arrest that night, but did state that he testified before the Grand Jury, which also subsequently indicted Jeanette Lawson for this assault on Clifton Lawson’s life.
Elmer Hicks testified that he was the former husband of Olean Hicks and lived in a house about three miles from her home where the shooting incident took place. Mr. Hicks stated that after being notified by Mrs. Hicks around 1:00 a. m. that his stepson had been shot, he immediately went to her home. He stated that after the *118 officers, the ambulance, and everyone else had left, he began mopping up the blood in the living room and also that blood which had been tracked throughout the house. Mr. Hicks testified that while in the process of cleaning up the home, he found a twelve gauge pump action shotgun “lying flat on the floor” behind a dresser in Olean Hicks’ front bedroom. He stated that a cursory inspection of the gun revealed no blood on the outside, and that he then placed the shotgun by the fireplace and called his stepson, Danny Lawson, and the District Attorney to inform them of his find. Mr. Hicks testified that Danny Lawson came by at a later time and took possession of the gun.
Danny Lawson testified that he was the stepson of Elmer Hicks and the brother of the assault victim, Clifton Lawson. He stated that in the early morning of September 28, 1975, his mother called him and told him that his brother had been shot. He testified he immediately went to his mother’s home and was the first one to arrive on the scene. The witness stated that after observing his brother lying on the living room floor, he left to “recall” the rescue squad, then returned to the house about the time the rescue squad was putting his brother in the ambulance. He further stated that he rode with his brother in the ambulance to the hospital in Mobile. Lawson testified that the following day he received a call from his stepfather, who told him to come up to Olean Hicks’ home because “he had found something.” He stated that when he arrived there, his stepfather “turned over to him” a loaded single barrel pump shotgun, but stated that no shell was lodged in the firing chamber. He concluded his testimony by stating that upon his initial arrival at Olean Hicks’ home on the night in question, he did not notice any type of weapon around his brother’s body.
Olean Hicks testified that around 1:00 a. m. on the morning of September 28, 1975, she was awakened by a call and knock on her front door. She stated that when she unlocked the door, she recognized the visitors to be her daughter-in-law, Jeanette Lawson, the appellant (Jeanette’s father), and several other members of the Gilmore family. Mrs. Hicks testified that when she noticed that the appellant “had something,” she tried to close the door to keep them from entering, but that they pushed the door open and knocked her down on the bedroom floor. Mrs. Hicks stated she hollered for her son, Clifton, just before she heard the blast of a shotgun in her living room. Although Mrs. Hicks stated that her mind went momentarily blank after the shot was fired, she did recall the appellant stating that, “he had come to get the kids and I meant to get them.” ' She testified that Larry and Farrell Gilmore then took the appellant out of her house and that she immediately called her stepson, Danny Lawson, and her ex-husband, Elmer Hicks. The witness stated that her phone “went out” and that she and the “two children” drove to her neighbor’s home and called the rescue squad. Mrs. Hicks testified that she returned to her home, then followed the rescue squad to Columbia General Hospital and later to the hospital in Mobile. She further testified that at no time during the “commotion” in her home did she see a shotgun near her son’s body. However, on cross-examination she stated that sometime before this shooting incident her son had placed a shotgun behind the dresser in her front bedroom to get it “away from the kids” and that she had noticed the shotgun was still there the afternoon prior to her son’s getting shot.
The victim of the appellant’s assault, Clifton Lawson, testified that he was asleep in the back bedroom of his mother’s home with his little son, Chris, and was awakened by his mother’s call to him. He stated that he got up to see what was wrong, and that when he had taken about four or five steps into the living room, the appellant shot him in the leg with a shotgun. He testified that he fell back on the couch, then heard the appellant declare, “I am going to go ahead and kill the S.O.B.,” and that then his wife, Jeanette, “ran in there and got in front of him.” Clifton Lawson stated that he did not have a shotgun in his hand at the time he was shot and that he did not say any *119 thing to the appellant before being shot by him. The witness stated that he was subsequently taken by the rescue squad to Columbia General Hospital and then later to Mobile where he remained hospitalized for about two and one-half months. Clifton Lawson testified that he owned a shotgun and that on an occasion previous to the time he was shot, he had placed it behind a dresser in his mother’s front bedroom. Mr. Lawson further testified that he and the appellant’s daughter, Jeanette Lawson, had been married for six years and were presently living together as husband and wife, although she, too, was under indictment for this assault on his life. The witness also stated that he had had no difficulties with the appellant prior to this shooting incident of September 28, 1975.
The appellant, Raymond Gilmore, testified that at the time Clifton Lawson was shot, his daughter, Jeanette Lawson, and Clifton Lawson were temporarily separated, and that his daughter had been living with him at his home in the Rawls School Community. The appellant stated that his daughter had requested him to accompany her to Olean Hicks’ home (where Clifton and their two children were then staying) so that she could pick up her daughter, Connie, who had been sick for several days with a virus. The appellant testified he was standing unarmed beside the car when his daughter, Jeanette, knocked on the front door of Olean Hicks’ home. However, the appellant did state that he had brought along his shotgun, but had left it inside the car which was also occupied by his two sons, Larry and Ferrell Gilmore, and his daughter-in-law. The appellant testified that Olean Hicks allowed his daughter to enter his home and that shortly thereafter Mrs. Hicks began “hollering for Clifton.” He stated that he then saw Clifton Lawson come out of the back bedroom with a gun, and, with this, he grabbed his shotgun from the front seat of the car, went into the house, and stood in the living room door. The appellant testified he told Lawson “to throw that gun down,” but that when Clifton Lawson “kept coming with it,” he shot him in the “interior part of the leg . between the kneecap and the hip.” The appellant stated that he was about twelve or fifteen feet from the victim when he fired, and stated he could have “shot him in the heart if I had wanted to.” The appellant testified that immediately after shooting Clifton Lawson, the members of his family who had remained outside in the car “came in and got me,” and that his oldest son, Larry, picked up Clifton’s gun, which was lying about three or four feet from his body, and placed it “behind the dresser to get it out of the way.” The appellant stated that Larry then took him back to his home.
Larry Gilmore testified that he, his wife and brother, Farrell, also accompanied his sister, Jeanette, to Olean Hicks’ home on the early morning in question. He stated that upon their arrival there, Jeanette went up to the front door and knocked while “daddy” (the appellant) stood outside between the car and front porch. The witness stated that when Jeanette entered the house, the appellant, who had his gun “with him all during the time,” followed her inside. The witness testified that almost immediately thereafter he heard “Olean talking to someone in a warning voice and then heard a gunshot.” Larry Gilmore stated his sister, Jeanette, “hollered” for his brother, Farrell, to come inside and that he and his brother then ran in the house and saw their sister kneeling beside Clifton Lawson’s body. The witness stated he saw a shótgun lying about two feet from the victim’s body, and that when his sister told him to take “daddy” home because “Olean was on the phone calling someone,” he picked the gun up and threw it behind the dresser in the front bedroom, then left with his brother and the appellant. The witness further testified that, “Nobody saw what I did with the gun,” but stated that he subsequently told his father, sister, and Sheriff Elie Har-rel that he had thrown the gun behind the dresser.
Jeanette Lawson testified that on September 28, 1975, she was temporarily living with the appellant, her father, at his home. She testified that she told him that night *120 that she wanted to go over to Olean Hicks’ home and talk with her husband, Clifton, to see if she could “get the kids” because her oldest daughter was “kind of sick,” and they (and several other members of her family) drove over to the Hicks’ home. The witness stated that after Mrs. Hicks learned of her purpose for being there and “saw my folks in the car,” she (Mrs. Hicks) began calling her names and fighting with her. The witness stated that during this confrontation, Mrs. Hicks screamed, “Come here quick, Clifton, it’s Jeanette,” and that about this time she heard a gunshot in the living room. She testified that she then ran into the living room where she saw the appellant, whom she had not seen enter the house, standing there with a gun and Clifton lying on the floor “crawling backwards.” The witness testified that she pleaded with the appellant, who appeared to be in shock, not to shoot Clifton again, and that her brother, Farrell, then came in and took the “gun away from daddy.” The witness further testified that because the entire incident “was such a turmoil,” the only weapon she noticed in the living room was the gun which her father had.
Farrell Gilmore testified he was sitting on the back seat of his sister’s car during the incident in question. He stated that the appellant was initially stationed by the front fender of the car, but when the appellant saw (through the living room window) Clifton Lawson enter the room with a gun, the appellant grabbed his gun off the car’s front seat and went into the house. The witness stated that through the front door of the house, he saw the porch light reflect off an object inside which appeared to be a gun in the hands of Clifton Lawson, but later testified he was uncertain if a gun indeed had reflected the light. The witness testified he heard a gunshot and that his sister then yelled for him to come inside. He testified he ran inside and “got daddy’s gun” and took it back outside and laid it on the hood of Jeanette’s car. He stated he then went back in the house and got the appellant and took him home. The witness further testified that during the excitement he did not see a gun “laying there on the floor anywhere” near Clifton Lawson’s body.
I
The appellant contends that his motion for new trial was due to be granted because the jury could not reasonably infer from the evidence presented that he intended to take Clifton Lawson’s life.
Because intent to take life is an essential element of assault with intent to murder, such intent must be satisfactorily proven by the State in order to support a conviction for the offense. Sparks v. State, 261 Ala. 2, 75 So.2d 103 (1954). This intent to take life may be shown by inference via the character of the assault, the use of a deadly weapon, and other attendant circumstances. Toliver v. State, 50 Ala.App. 654, 282 So.2d 92 (1973); Roberts v. State, 49 Ala.App. 729, 275 So.2d 709 (1973); Sparks v. State, supra.
The appellant does not dispute the fact that he shot Clifton Lawson with a deadly weapon (a twelve gauge double barrel shotgun), yet contends in his brief that the jury mistakenly “over emphasize[d] the deadly nature of a weapon an under emphasize[d] the non-deadly ‘attendant circumstances.’ ” The appellant cites as “attendant circumstances in his cause, which should have been given greater consideration by the jury, the fact that he had gone to Olean Hicks’ home on the early morning in question only at the request of his daughter; that he testified he deliberately aimed at Clifton Lawson’s leg when he could have shot him in the heart or face; and that the victim’s own testimony revealed that he (the appellant) had the opportunity to shoot a second time had he wanted to kill Clifton Lawson.
However, the jury may give to this evidence, as they may with all evidence, such emphasis and weight as they alone think proper in reaching their verdict. Wilcutt v. State, 284 Ala. 547, 226 So.2d 328 (1969); Braswell v. State, 51 Ala.App. 179, 283 So.2d 630 (1973). We do not feel that it was unreasonable for the jury to infer the intent to take life from all the evidence *121 presented at trial, which included the fact that the appellant leveled and fired a twelve gauge shotgun from twelve feet away at a man whom they presumably believed to be unarmed. Moreover, there is a strong presumption in favor of the correctness of the jury’s verdict, and this presumption is further bolstered when the trial judge, who like the jury hears the witnesses’ testimony and observes their demeanor, declines to grant a new trial. Toliver v. State, supra, and authorities therein cited.
We therefore conclude that the verdict of the jury was not patently against the weight of the evidence, thus, there was no error in the trial court’s denial of the appellant’s motion for new trial. Johnson v. State, 51 Ala.App. 172, 283 So.2d 624 (1973); Jones v. State, 40 Ala.App. 419, 114 So.2d 575 (1959).
We have carefully examined this record and find same to be free of error. The judgment of the trial court is due to be and the same is hereby
AFFIRMED.
All the Judges concur except CATES, P. J., not sitting.