The appellant was indicted on a charge of assaulting Carolyn Hughley with intent to murder her. On the date set for arraignment he was committed to Bryce Hospital for a determination of his competence to stand trial.
Two months later he was returned to Chambers County Jail. Subsequently, he was arraigned and pleaded not guilty and not guilty by reason of insanity. Then, approximately one year from the time of his arrest, he was tried by a jury, convicted of assault with intent to murder, and sentenced to seven years imprisonment.
In October, 1978, the appellant lived with Carolyn Hughley and her two children. On October 18, 1978, during a trip to Montgomery the appellant began to argue with Ms. Hughley, and told her, "When I get you home, I'm going to kill you." After they got home the appellant continued to argue with her until she fell asleep. She was later awakened by the appellant cutting her on the back with a butcher knife. According to Ms. Hughley, the appellant cut her numerous times and hit her with a hammer. Ms. Hughley testified that the assault with the knife continued through the night, and it was not until noon the following day that the appellant took her to the hospital. Ms. *Page 87 
Hughley testified that the appellant informed the hospital personnel that she (Ms. Hughley) had been in an automobile accident.
Dr. Ray DeGuzman, a physician in LaFayette, Alabama, testified that in October, 1978, he saw Carolyn Hughley in the emergency room of the Chambers County Hospital. He treated Ms. Hughley for multiple lacerations which were attributed, he was told, to an automobile accident. He testified that Ms. Hughley was not bleeding upon her admission to the hospital, but stated that if the bleeding had continued she would have died. Dr. DeGuzman said that one hundred to one hundred and twenty sutures were required to close the deep lacerations; although no one cut would have been fatal, without treatment the multiple wounds would have caused death.
The testimony of Terry Johnson, Ms. Hughley's twelve-year-old son, corroborated his mother's account of the incident. He testified that he saw the appellant go to the kitchen and get a butcher knife and then strike his mother with the knife.
At the end of Terry Johnson's testimony, the appellant made a motion to exclude the evidence because of the State's failure to present a prima facie case. He argued that the evidence offered by the State showed that the injuries "were not sufficient to produce death and were not calculated to cause death."
The court denied the motion and the appellant called four witnesses in his behalf. George Connors, a field examiner for the Veteran's Administration, testified that he had known the appellant for approximately ten years and that, in his opinion, the appellant could not distinguish right from wrong at the time of the offense.
William O. Walton, Jr., an attorney in LaFayette, Alabama, testified that he had been appointed guardian for the appellant in April, 1970. In that capacity he made regular reports to the probate court on how money paid to the appellant by the Veteran's Administration had been spent. Further, he said that he knew the appellant had been in the Veteran's Administration Hospital in Tuskegee some nineteen different times. Mr. Walton also testified that he had seen the appellant on October 19, 1978, at ten o'clock in the morning, and it was his opinion that the appellant was unable to distinguish right from wrong at that time.
Lorenza Linson, the appellant, testified in his own behalf. He stated that, on the day of the incident, he had been taking medication and drinking. Appellant testified that he felt himself getting sick that day and he did not know what happened, but he related the following events:
 "I started getting up, I got mad and me and her fought from the bedroom to the kitchen and when I got to the kitchen she reached for the knife and I come up and I had the hammer and swung at her head and broke out a pane in the living room."
The appellant explained that he thought Ms. Hughley was "going out" with someone else. He admitted that he had "cut her" across the shoulders "just a couple of times," but explained, "I was so mixed up."
During cross-examination, appellant admitted that he had told the hospital personnel that Carolyn Hughley had been in a car wreck because he did not want to "get locked up." He acknowledged that the reason he cut her in the face was because he "wanted her scarred so nobody else would have her."
Julian Woodhouse, a doctor of clinical psychology, stated that he first saw the appellant in August, 1979, at the Chambers County Jail. At that time appellant was quite irrational. Dr. Woodhouse stated that, in his opinion, the appellant was dangerous, could not be treated properly in a local facility, and should be transferred to a secure psychiatric hospital. Dr. Woodhouse testified that he had seen the appellant on two other occasions in October, 1979, and it was his opinion that appellant was schizophrenic-paranoid type. Dr. Woodhouse also gave his opinion that the appellant was suffering from a severe mental disease on the night of the incident. He said it was his observation that the appellant could not tell the difference between right and wrong in all situations. *Page 88 
 I
The appellant complains that he was deprived of his constitutional right to a speedy trial as guaranteed by the Sixth and Fourteenth Amendments of the Constitution of the United States.
In Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182,33 L.Ed. 101, the United States Supreme Court ruled that speedy trial cases must be approached on a "ad hoe basis" using a "balancing test in which the conduct of both the prosecution and the defendant are weighed." Id., 92 S.Ct. at 2181-92. The court outlined four factors which should be assessed in determining whether a particular defendant has been deprived of his right to a speedy trial. Those four factors were identified as: "[L]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." Id.
The Court found "no constitutional basis for holding that the speedy trial right can be quantified into a specified number of days or months." Id, 92 S.Ct. at 2188.
In determining whether the appellant has been deprived of his right to a speedy trial the following sequence of events should be analyzed:
1) October 19, 1978, appellant arrested and incarcerated.
2) March 1, 1979, indictment against appellant.
3) March 8, 1979, order by circuit court for appellant to undergo a mental examination.
4) March 13, 1979, appellant committed to Bryce Hospital.
5) April 30, 1979, letter from Bryce Hospital Forensic Unit Co-ordinator to circuit court stating that appellant was diagnosed as schizophrenic-paranoid type when he entered Bryce Hospital, and that, as of April 24, 1979, he had been re-evaluated and found competent to stand trial. The letter requested that an appropriate order be issued remanding custody of the appellant to the Chambers County Court.
6) May 9, 1979, order from the circuit court to the sheriff of Chambers County to return the appellant from Bryce Hospital to Chambers County.
7) August 29, 1979, arraignment; trial set for October 25, 1979.
8) October 25, 1979, motion to dismiss for lack of speedy trial filed; case continued in order to obtain Bryce Hospital records.
9) October 31, 1979, trial.
The appellant argues that the period of approximately one year from the time of his arrest until trial constituted "undue and oppressive incarceration" and, "obviously impaired the ability of Mr. Linson to defend himself."
This court in Andrews v. State, Ala.Cr. App., 370 So.2d 1072, cert. den. 370 So.2d 1075, stated: "There is no fixed length of time that is considered to be per se unreasonable." The United States Supreme Court, in Barker v. Wingo, supra, reasoned that, "[U]ntil there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance."
In the present case, approximately four and one-half months transpired between the arrest of the appellant and the court order to undergo a mental examination. Thereafter, the appellant remained in Bryce Hospital for approximately two months. After his release from Bryce Hospital, the appellant spent approximately three months in jail before his trial date was set. During that time, and at all other times appellant was incarcerated, he was unable to make bond. Based on the circumstances involved in the case before us, the delay in bringing appellant to trial was not, in our judgment, unreasonable or "presumptively prejudicial." Barker v. Wingo, supra.
The court order committing the appellant to Bryce Hospital was pursuant to § 15-16-20, Code of Alabama 1975. Consequently, the postponement of appellant's trial was partially due to procedural safeguards invoked for his protection to assure that he was mentally competent to stand trial.
In Cook v. State, Ala.Cr.App., 333 So.2d 855, this court stated: *Page 89 
 "A defendant cannot claim his Constitutional rights have been denied . . . where delays are made necessary by the law itself."
In the present case, the appellant's assertion of his speedy trial right did not come until October 25, 1979, the date the case was set for trial.
The appellant insists that the delay between his arrest and the order for the mental examination "greatly decreased the likelihood of any professional being able to testify as to the state of mind and intent of the defendant on the date of the occurrence." As a result, appellant claims that his ability to defend himself was impaired.
Dr. Woodhouse, who was the only expert witness in the field of mental health called by the defendant, did not, however, state that his ability to formulate an opinion of the appellant's mental condition was affected by the passage of time. The record reveals the following:
 "THE COURT: Doctor, based on your review of the history of the defendant, based upon your examination of him, do you have an opinion whether or not he was on that night of October the 18th — 19th, 1978, suffering from a mental disease that is paranoid-schizophrenia?
"A. Yes, sir, I do have an opinion.
"THE COURT: What is that opinion?
 "A. It's my opinion that at that time, to the best of my judgment, he was continuing to suffer from schizophrenia-paranoid type and at that time that condition would have been active, in other words it wouldn't have been in remission. He would have been suffering severely from that.
 "THE COURT: In your opinion at that time, that is the night of October 18th and in the morning of October 19th as the result of his mental disease was he able to determine the difference from right and wrong?
"A. I don't know.
"THE COURT: You don't have an opinion?
. . . . .
 "A. I have an opinion but it may not fit exactly what you're getting at.
"THE COURT: Tell us what your opinion is?
 "A. It's my opinion that at that time, given that he was suffering from that disorder and had not been properly treated for it. . . . That at that time there would have been areas where, in fact, he could not tell the difference between right and wrong and there would have been areas where he would have told the difference between right and wrong. I'm not sure how his thinking would match up with this particular offense other than saying there certainly were areas where his thinking would have been severely disturbed but I can't say that right or wrong with respect to the particular alleged act. I can't read his mind about that. I can simply say that someone suffering from that illness is going to have a number of very large areas where fantasy mixes in with reality and the person cannot distinguish between right and wrong.
. . . . .
 "Q. I mean, if he knew the difference between right and wrong on a particular evening, the particular evening in question, do you have an opinion as to whether or not his free agency or power to choose between right and wrong was affected by his mental disorder?
"A. I really have no opinion on that."
In our judgment, the appellant did not show that actual prejudice resulted from the delay, see Yarber v. State, Ala.Cr.App., 368 So.2d 868; Moss v. State, 50 Ala. App. 643,282 So.2d 82, or that his pretrial incarceration was of such an oppressive nature that he was "hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense." Barker v. Wingo, supra.
 II
The appellant contends that the trial court committed reversible error by commenting on the operation of State mental *Page 90 
hospitals and their policy regarding release of patients. The comments complained of, in pertinent part, are found in the following portions of the record.
 "Q. All right. Do you have an opinion as to what effect the failure of Mr. Linson's mental disease that he had would be to not take his medicine?
 "MR. WALLACE: We object, if the Court please, we object to him not taking his medicine. He couldn't possibly know what effect it would have.
. . . . .
"THE COURT: He can qualify that.
. . . . .
 "Q. First of all, do you know what effect these medications that you related that Mr. Linson is taking have on a person who is suffering from a mental disease, disorder that you have determined is of the schizophrenia-paranoid type?
"MR. WALLACE: And we object.
 "THE COURT: Overruled. That's been part of your training. The Court will sustain the objection and let you further qualify him.
 "A. It's through my experience and observation of working in the hospital and, essentially, my work in probate court is returning people to the hospital and seeing people when they stop taking their medication. I am not a pharmacist, I'm not trained in —
. . . . .
 "Q. How many commitment hearings have you participated in for people suffering from this type of mental disorder to date?
 "MR. WALLACE: If the Court please, that has nothing to do with this man sitting over here. Commitment hearings are a joke and the Court knows it.
 "MR. COOK: Your Honor, I object to the comments by the district attorney and would ask he be instructed not to make such comments that commitment hearings are a joke. They're not very much a joke to the mentally disabled.
 "THE COURT: You can ask the witness how many cases he has participated in with persons having a diagnosis of paranoid-schizophrenia —
 "THE COURT: Who are using medications and failure of the patient to take them and the result it has on the behavior of the patient.
 "A. Any person suffering from a severe mental illness when they are placed on those medications, any one of the major tranquilizers, my experience and, I think, the experience of everyone, almost everyone working in this area, is when these people stop taking their medication they run a very severe risk of their condition again becoming worse and having to return to the hospital. I know when I worked in the hospital one of the first questions we would ask would simply be, `How long have you been off your medication?' Sometimes that would clear it, if they take it they do well, if they don't take it they do poorly. That's not to say that I understand the breakdown or the mechanism that works, the literature on these medicines is that each time at the very top they start and say `we don't know the precise way that this works but it does seem to help people suffering from certain types of mental disorders.'
 "THE COURT: In other words doctor, when these patients come back to the hospital in a pretty bad mental state brought on in part because they have not been taking their medication?
"A. That's right.
 "THE COURT: And once you get them back on their medication then they get for all practical matters all right and you turn them loose and you put them back on the street and you say they are competent and you put them back on the street and they retain this good condition, retain their good condition until they quit taking their medication again and then they become dangerous?
"A. That's correct.
 "THE COURT: And so whether or not they remain stable or whether or not they become dangerous after their release from the mental hospital depends solely on whether that person voluntarily takes his medication as prescribed? *Page 91 
"A. Not solely but in large part it does.
 "MR. COOK: If it please the Court, we would like to object to the Court's taking over this case and we think it is highly prejudicial, the comments of the Court in that particular case and would move for a mistrial.
"THE COURT: Motion denied."
In support of his contention, the appellant has cited Boylev. State, 229 Ala. 212, 154 So. 575; Dunn v. State, 277 Ala. 39, 166 So.2d 878, and Whisenhant v. State, Ala.Cr. App.,370 So.2d 1080. In these cases, direct references to confinement in mental institutions because of a verdict of not guilty by reason of insanity were made by prosecutors in closing argument. No such references were made by the trial judge in the present case.
It was the defense counsel who first elicited from his own witness information concerning the effect of failure to take prescribed medication on the behavior of a paranoid-schizophrenic. The witness answered, "[W]hen these people stop taking their medication they run a very severe risk of their condition again becoming worse and having to return to the hospital."
The comments by the trial judge in the present case were an effort to clarify the testimony already given, and, in our judgment, were proper. See Sprinkle v. State, Ala.Cr.App.,368 So.2d 554. At no time did the trial judge comment on what might happen if the appellant were sent to a mental hospital instead of to the penitentiary. The court's comments referred to paranoid schizophrenics who are returned to the hospital because of failure to take their medication, and not to paranoid schizophrenics who are sent to the hospital because they have been found not guilty by reason of insanity.
The trial judge was within his discretion in questioning the witness. In Sprinkle v. State, supra, this court observed:
 "The trial judge is more than a mere moderator and it is his duty to conduct an orderly trial and to make certain as far as possible that there is no misunderstanding of the testimony of witnesses. Thus he may ask any question which would be proper for the prosecutor or defense counsel to ask so long as he does not depart from a standard of fairness and impartiality."
We do not believe the trial judge departed from the necessary standard of fairness and impartiality here. See Johnston v.City of Birmingham, Ala.Cr.App., 338 So.2d 7.
 III
The trial court, in the present case, overruled the appellant's motion to exclude. It also denied the appellant's request for the affirmative charge and a motion for new trial. Thus, the questions of the sufficiency and the weight of the evidence are properly before us.
Assault with intent to murder is an assault with intent to take life under circumstances which, if successful, would constitute murder. Horn v. State, 98 Ala. 23, 13 So. 329;Sanders v. State, Ala.Cr. App., 354 So.2d 44. Although intent may be inferred from the character of the assault, the use of a deadly weapon, and attending circumstances, there can be no assault with intent to murder without a present intention aswell as a present ability to commit the offense. Marshall v.State, 21 Ala. App. 500, 109 So. 558.
The evidence in the present case clearly shows that appellant had the present ability to commit murder. The assault was unprovoked. Appellant took a butcher knife from the kitchen and "cut" Carolyn Hughley numerous times on her body. Further, the testimony from the attending physician indicates that, although the lacerations alone could not have caused death, the victim could have died from a loss of blood. The inference is also unmistakable that appellant had the present intent to commit the offense. He wanted the victim "scarred" so nobody else would have her, and he did not bring her to the hospital until noon the day following the infliction of her wounds. Therefore, it is our judgment that the State presented a prima facie case.Sanders v. State, supra. *Page 92 
It was within the province of the jury to give the evidence in the case whatever weight and emphasis they thought proper in reaching their verdict. Willcutt v. State, 284 Ala. 547,226 So.2d 328; Braswell v. State, 51 Ala. App. 179, 283 So.2d 630;Gilmore v. State, Ala.Cr.App., 339 So.2d 116. It was not unreasonable for the jury to infer an intent to take life from all the evidence presented at trial. In our judgment, the verdict of the jury was not contrary to the weight of the evidence, and there was no error in the trial court's denial of the motion to exclude, the requested affirmative charge, and the motion for a new trial. See Johnson v. State, 51 Ala. App. 172, 283 So.2d 624; Jones v. State, 40 Ala. App. 419,114 So.2d 575.
We have searched the record and find no error prejudicial to the appellant; therefore the judgment of conviction by the Chambers Circuit Court is affirmed.
AFFIRMED.
All the Judges concur.