JOHNSTONE, Justice.
On November 1, 1996, a jury convicted Rodney Stacey Bullock of arson in the second degree, a violation of § 13A-7-42, Ala.Code 1975.[1] The trial court sentenced him to five years’ imprisonment, but split the sentence and ordered Bullock to serve *1064 one year in prison and five years on probation. The Court of Criminal Appeals, on August 14, 1998, affirmed Bullock’s conviction and sentence in an unpublished memorandum. Bullock v. State (No. CR-96-0641), 741 So.2d 480 (Ala.Crim.App.1998) (table). The Court of Criminal Appeals overruled Bullock’s application for rehearing and denied his Rule 39(k), Ala. R.App. P., motion. Bullock petitioned this Court for certiorari review, which we granted to determine whether the State presented sufficient evidence to corroborate accomplice Homer Leonard Raines’s testimony that Bullock solicited him to set fire to Bullock’s house.
The testimony of Homer Leonard Raines, a convicted felon and an old friend of Bullock, is summarized as follows. He participated in the arson, but he has not yet been formally charged for the offense. Bullock visited him in January 1982 and asked him to burn Bullock’s house. The only explanation Bullock gave for wanting his house burned was that he and his wife, Judy, were getting a divorce. On or about January 24,1982, Raines rode with Bullock to Bullock’s house. Raines looked around inside the house while Bullock sprayed the interior of the garage with gasoline. During his survey of the house, Raines noticed a fuse box in a small closet on the second floor of the house. Before they left the house, Raines and Bullock loaded a television, a CB linear amp and radio, a guitar, and a saddle into Bullock’s vehicle. Shortly after they left the house, Bullock and Raines stopped at a nearby shopping mall, where Raines purchased a can of Ronson cigarette lighter fluid and a pair of gloves. Raines testified that he returned, either later that night or the next day, to Bullock’s residence with Wally Booker and started a fire in the house.[2] Raines entered the front door of the house with a key Bullock gave him. He went upstairs to the small closet and saturated the electrical fuse box and some clothes in a box in the closet with cigarette lighter fluid. He then lit a match, threw it in the closet, and left the house. As payment for starting the fire, Raines received the television, the CB linear amp and radio, and the guitar, which he and Bullock had previously removed from the house. Raines gave the CB linear amp and radio to Ricky Kent in exchange for a banjo, and he gave the guitar to Jerry Mixon.
Ricky Kent’s testimony showed that in 1982, he gave Raines a banjo in exchange for a CB linear amp and radio.
James Munger, a fire marshal who investigated the arson immediately after the fire was extinguished, contradicted Raines’s testimony. Munger’s testimony is summarized as follows. There was no forced entry into the house; in fact, two doors to the house were unlocked. He did not smell any gasoline in or around the house. The closet where the fire was started did not contain an electrical fuse box, as Raines had stated. The only electrical fixtures in the closet were a lightbulb and a light switch. Neither was harmed by the fire. The fire was not electrical or otherwise accidental. Rather, it was started with an accelerant which had been placed on the boxed clothes in the closet and then ignited with a match. The type of accelerant used could not be detected because the items in the closet were destroyed by the fire. From his experience, Munger believed that cigarette lighter fluid may have been used to start the fire because such an accelerant could not be detected after the fire. After Munger discovered that the fire was not accidental, he investigated Bullock’s financial situation. Bullock’s house was insured for $114,000. Bullock was past due on the mortgage note by $4400, and the house was subject to foreclosure.
Dale Kocher, a friend and neighbor of Bullock, verified that Bullock had a home *1065 owner’s insurance policy worth $114,000. Kocher testified as follows. Kocher worked at the insurance company which insured Bullock’s house. In the fall of 1981, either Bullock or his wife Judy requested an increase in insurance coverage, but the request was denied because the increased coverage would have been more than the value of the house. Just before Thanksgiving of that year, Bullock and Judy were having marital problems. As a result, Judy and Jim Jenkins, a young man who lived with the Bullocks during that time, temporarily moved into Kocher’s house for about ten days. Judy, however, did not move any furniture into Kocher’s house. Thereafter, Judy and Jim moved into an apartment together. On the evening before the fire, Bullock called Kocher, told him that he was going to out of town to his mother’s house, and asked him to feed his two dogs and cat the next day. Early the next morning, Kocher, noticing a “mist” above Bullock’s house, went to the house to determine the source of the “mist.” Although Kocher had a key to Bullock’s house, he did not use it because the side door in the garage area was unlocked. When he walked into the house, Kocher heard smoke alarms and saw smoke. He hurried back to his house and called the fire department. Kocher and his wife then returned to Bullock’s house. Kocher did not smell gasoline in the garage area. Upon entering the house, Kocher noticed that very little furniture was in the house. Kocher verified that a pump house was located about fifty yards behind Bullock’s house. According to Kocher, Bullock did not file a claim for insurance on the house, but the mortgage company did.
Larry Criswell, a claims agent for the insurance company which insured Bullock’s house, interviewed Bullock after the fire and recorded the interview. Criswell’s testimony about the interview is summarized as follows. At the time of the fire, Bullock and his wife owed a $98,000 mortgage note on the house, and they were four months in arrears on their mortgage payments. The mortgage company claimed insurance to cover the loss caused by the fire. Bullock told Criswell he was at his mother’s house the afternoon and the evening before the fire. Early in the morning on the day of the fire, Bullock drove his mother to Texas to speak with her psychic advisor. Bullock learned about the fire when he returned to his house the day after the fire had occurred. Bullock noticed a television, a radio, and a CB radio and linear amp were missing from his house after the fire. Bullock told Criswell that he thought he locked the doors to his house when he left the house the day before the fire. Dale Kocher and Dale Cobb had keys to Bullock’s house.
Dale Cobb’s testimony was as follows. Cobb was an old college friend of Bullock and Judy. He frequently talked with Bullock around the time Bullock and Judy were separated and were awaiting divorce. Bullock told Cobb that Bullock had financial problems. Bullock said that everything around him was going up in smoke and that he wished the house would go up in smoke too so he could start all over. Within one to three weeks after Bullock told Cobb about his problems, Bullock’s house was burned.
Judy Bullock Ash was married to Bullock from 1967 to 1982. She testified as follows. In October 1981, Bullock and she allowed one of her former students, Jim Jenkins, a juvenile delinquent, to move in with them. Shortly thereafter, Bullock became jealous of the relationship between Judy and Jim. After an • altercation with Bullock, Judy and Jim left the Bullocks’ house and stayed with the neighbor Dale Kocher for a few days. Sometime thereafter, Judy and Jim moved into an apartment. According to Judy, she and Jim were staying at the Kochers’ house when the Bullocks’ house was burned. Judy was notified about the fire while she was at school. When she returned to the house, Judy noticed that certain items in the house had been either rearranged or re *1066 moved from the house. Some fine china and depressionware had been removed from the china cabinet in the formal dining room, and everyday china had been placed in the cabinet. A sofa table and a pie safe containing memorabilia from the Bullocks’ relationship were missing from the den, and were later found in the pump house behind the Bullocks’ house. A bachelor’s chest and a vanity table and stool were missing from the Bullocks’ bedroom. Most of Bullock’s clothes were missing from the bedroom closet. Judy also noticed that an ornate jewelry box and a purple electric razor which belonged to her were missing from the house. According to Judy, because she and Bullock always locked the doors to their house, it was unusual that the house was not locked at the time the fire occurred.
The testimony of Sharon Brooks, who was Raines’s girlfriend in 1982, showed that Raines gave her the jewelry box and purple electric razor which Judy reported as missing from the Bullock house after the fire.
The Court of Criminal Appeals found that the following evidence was sufficient to corroborate accomplice Raines’s testimony and to support the jury’s finding that Bullock was criminally connected to the arson:
“1.) Evidence that [Bullock], at the time of the fire, was in extreme financial difficulty — a four month delinquency in his mortgage payments on his residence also with a notice of foreclosure; very little cash in bank accounts, including a number of accounts which were overdrawn; delinquent automobile loan payments; recent foreclosures on various parcels of property which he owned; and the discontinuance of telephone service in his residence due to non-payment of his telephone bill. (R. 120-21)
“2.) Evidence that [Bullock] moved certain items of furniture, including collectible items, china, silver, crystal and family keepsakes, as well as most of his clothes, out of the house just before the fire occurred. (R. 328-31; 339 — 42; 345-56)
“3.) Evidence that [Bullock] attempted to substantially increase the amount of insurance coverage on his house just before the fire. (R. 156-57)
“4.) Evidence that [Bullock] told his close friend, Dale Cobb, a few weeks before the fire, that [Bullock] wished that his house would burn so that he could ‘start over.’ (R. 293)
“5.) Evidence that the fire investigator found no sign of forced entry into [Bullock’s] house and, in fact, the front door was unlocked when firefighters arrived at the scene to put out the fire. (R. 103-05; 126-27)
“6.) Evidence that [Bullock] was unable to explain how the accomplice, Homer Leonard Raines, was able to relate to a fire investigator details and knowledge about the location of [Bullock’s] house without having visited [Bullock’s] home before (the address at the time of the fire was a route and box number, not a street address), its layout and the location of the fire’s origin that only the person responsible for setting the fire could have had. (R. 270-72)
“7.) Evidence that, just after the time of the fire, Raines gave his common-law wife a distinctive ornate jewelry box and an electric razor with a purple handle that were very similar to items that Judy Ash, who was [Bullock’s] wife at the time of the fire, testified were missing from the house after the fire. (R. 220-23; 340-42)
“8.) Other evidence that a citizen’s band (‘CB’) radio amplifier, which Judy Ash testified was identical to one that belonged to [Bullock], was in the possession of Ricky Kent, who testified that he obtained the amplifier from Raines, although on cross-examination, the time frame within which he received the amplifier was in conflict. (R. 339-40; 239-40).”
*1067 Under § 12-21-222, Ala.Code 1975, a felony conviction “cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant ivith the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient.” (Emphasis added.) In reviewing a claim of insufficient corroboration, the Alabama appellate courts have stated that
“[t]he test for determining whether there is sufficient corroboration of the testimony of an accomplice consists of eliminating the testimony given by the accomplice and examining the remaining evidence to determine if there is sufficient incriminating evidence tending to connect the defendant with the commission of the offense.”
Andrews v. State, 370 So.2d 320, 321 (Ala.Crim.App.), cert. denied, 370 So.2d 323 (Ala.1979), citing Miller v. State, 290 Ala. 248, 275 So.2d 675 (1973). The evidence corroborating the accomplice’s testimony and connecting the defendant to the offense can be purely circumstantial evidence. Mathis v. State, 414 So.2d 151 (Ala.Crim.App.1982). But, “ ‘[i]t must be of a substantive character, must be inconsistent with the innocence of the accused, and must do more than raise a suspicion of guilt....’ Soyrell v. State, 249 Ala. 292, [293,] 31 So.2d 82, 83 [ (1947) ].” Ex parte Bell, 475 So.2d 609, 613 (Ala.), cert. denied, 474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985).
Although the corroborative evidence need not be strong or sufficient in and of itself to support a conviction, it must establish some fact tending to prove the guilt of the defendant. Ex parte Bell, 475 So.2d at 613; Andrews, supra. In determining a defendant’s culpability,

“[t]he entire conduct of the accused may be surveyed for corroborative circumstances and if from them his connection with the offense may be fairly inferred the requirement of the statute is satisfied.

“And statements made by the defendant, in connection with other testimony, may afford corroboratory proof sufficient to sustain a conviction.” (Emphasis added.) (Citations omitted.)
Moore v. State, 30 Ala.App. 304, 306, 5 So.2d 644, 645 (1941), cert. denied, 242 Ala. 189, 5 So.2d 646 (1942). Proof of a defendant’s motive, alone, is not sufficient to corroborate an accomplice’s testimony and to connect the defendant to the crime. Sorrell v. State, 249 Ala. 292, 31 So.2d 82 (1947). However, proof of a defendant’s motive coupled with other facts connecting the defendant to the crime may be sufficient to corroborate an accomplice’s testimony. Thompson v. State, 374 So.2d 388 (Ala.1979); Slayton v. State, 27 Ala.App. 422, 173 So. 632, rev’d on other grounds, 234 Ala. 1, 173 So. 642 (1936). “[T]he weakness of the corroborating evidence, in and of itself, does not preclude a finding that such evidence tends to connect the defendant with the commission of the offense. Where such a finding is made, the weakness and inconclusiveness, vel non, of the corroborating evidence is determined by the jury.” Thompson, 374 So.2d at 390-91 (citations omitted).
The Court of Criminal Appeals held that each piece of corroborative evidence, when considered separately, is not sufficient to connect Bullock to the arson, but that, when the pieces of evidence are considered collectively, they are sufficient to corroborate accomplice Raines’s testimony and to connect Bullock to the arson. While we do not agree entirely with the rationale of the Court of Criminal Appeals, we agree with the conclusion.
Although the evidence which the Court of Criminal Appeals recites in 5 through 8 above tends to confirm accomplice Raines’s testimony about the circumstances surrounding the fire, it does not contribute substantially to a connection between Bullock and the arson. On the other hand, the evidence recited in 1, 2, and 3 above consti *1068 tutes a foundation for corroboration, and the evidence recited in 4 completes the corroboration itself. The evidence recited in 1 tends to prove that Bullock had a motive to burn his house — that motive being to reduce his debt load, even if only by causing insurance proceeds to extinguish his mortgage note debt. The evidence recited in 2 and 3 concerning Bullock’s removal of certain items from the house and his attempt to obtain an increase in the amount of insurance coverage on the house tends to prove the performance of initial stages of an arson scheme. Finally, the evidence recited in 4 regarding Bullock’s statement that he wished the house would go up in smoke so he could start over, interpreted in the context of his motive and his preliminary actions, completes a substantive connection between Bullock and the arson in a way inconsistent with Bullock’s innocence.
The nature of a “crime for hire” is that a physical connection between the defendant and the crime, or even the scene of the crime, may never exist. The defendant hires an accomplice for the purpose, among others, of avoiding a physical connection or presence. Thus, the corroboration of an accomplice’s testimony may be accomplished by a number of pieces of circumstantial evidence, which, when considered collectively, support a reasonable inference by the jury that the defendant participated in the crime charged by hiring the accomplice to commit the physical acts necessary to perpetrate the crime. See Colvette v. State, 568 So.2d 319 (Ala.Crim.App.1990) (arson for hire). Indeed, the corroboration of an accomplice’s testimony in cases of “crimes for hire” may consist primarily of the defendant’s statements, which, interpreted by reference to the circumstances, tend to connect the defendant to the crime. See Prewitt v. State, 460 So.2d 296 (Ala.Crim.App.1984) (murder for hire).
In the case before us, the defendant’s statement that he wished his house would go up in smoke so he could start over, interpreted by reference to the other circumstantial evidence, was sufficient for the jury to infer that the defendant arranged for his house to be burned. Because we find sufficient evidence to corroborate the accomplice’s testimony concerning the defendant’s participation in the arson, we affirm the judgment of the Court of Criminal Appeals.
AFFIRMED.
HOOPER, C.J., and HOUSTON, COOK, SEE, LYONS, and ENGLAND, JJ„ concur.
MADDOX, J., concurs in the result.
BROWN, J., recuses herself.*

. Although the arson occurred in January 1982, no indictment was returned against Bullock at that time. Prosecution for arson is not barred by any statute of limitations. §15-3-5(a)(5), Ala.Code 1975.

. Wally Booker did not testify, and the record does not reflect that he gave any statement regarding the arson.