Rel: August 23, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2023-2024

———————————————

## CR-2023-0207

———————————————

## Travon Romance Williams

## v.

## State of Alabama

## Appeal from Montgomery Circuit Court
## (CC-18-110)

PER CURIAM.

AFFIRMED BY UNPUBLISHED MEMORANDUM.

McCool, Cole, and Minor, JJ., concur. Kellum, J., concurs in the result. Windom, P.J., dissents, with opinion.

WINDOM, Presiding Judge, dissenting.

Travon Romance Williams appeals from his convictions for two counts of capital murder, see § 13A-5-40(a)(2), Ala. Code 1975, and his resulting sentences to life in prison.[1]  He argued on appeal, as he did at the close of the State's case-in-chief and again at the close of all evidence, that there was no evidence presented to corroborate the testimony of his alleged accomplices – Martavius Tyus, Jordan Graham, and Tarick Moore.  The majority, in an unpublished memorandum, affirms Williams's convictions, holding that the accomplices' testimony was sufficiently corroborated.  I respectfully dissent.

The majority summarizes the evidence as follows:

"In September 2015, Dundrell Young was shot and killed as he sat in his vehicle in the parking lot of a Burger King fast food restaurant on East South Boulevard in Montgomery. Witnesses at the scene identified the shooter as a young, slim, dark-skinned black male with a bandana over his face. One witness saw the shooter leaning in the driver's side of Young's vehicle. She stated that as the shooter got out of the vehicle, he tucked a handgun inside his jeans.

_____

[1] Williams was convicted of one count of murder made capital for taking the life of Dundrell Young through the use of a deadly weapon while Young was in a vehicle, see § 13A-5-40(a)(17), Ala. Code 1975, and one count of murder made capital because he committed it during the course of a robbery, see § 13A-5-40(a)(2), Ala. Code 1975.  Williams was 17 years old at the time of the offense.

2

"Det. Reginald K. Dabney of the Montgomery Police Department interviewed Young's friend, Ronald Dickerson. Dickerson told Det. Dabney that, on the day of the murder, Young had planned to sell an AR-15-style rifle and that Martavius Tyus would accompany Young during the transaction. Dickerson also told Det. Dabney that Young had his firearm, a Smith & Wesson brand .40-caliber revolver, in his possession that day.

"After speaking with Dickerson, Det. Dabney interviewed Tyus. Tyus first denied having any knowledge about the murder. But when confronted with video-surveillance footage from the Burger King showing his red Mustang in the restaurant's drive-through at the time of the shooting, Tyus admitted his involvement in Young's death. Tyus told Det. Dabney that he had arranged for Young to be robbed by Jordan Graham. Tyus stated that he was on the telephone with Graham as Graham arrived at the restaurant with Tarick Moore and Williams. Upon Graham's arrival, Tyus pulled into the restaurant's drive-through lane to order food. Moments later, he heard gunshots. Tyus quickly pulled out of the drive-through lane without getting the food for which he had paid and left the area. Tyus identified 17-year-old Williams as the individual who had shot Young.

"Along with Tyus's statement, video-surveillance footage placed Moore's vehicle at the scene. When questioned by investigators, Moore stated that Graham had telephoned him the evening of the murder and asked him for a ride to Burger King to meet with Tyus to smoke marijuana. Moore went to Graham's house, where he picked up Graham, Williams, and Graham's girlfriend, Carianna Lewis. Moore drove Lewis to the Belmont Apartments complex to visit with his girlfriend. After leaving Lewis at the apartment, Moore drove to the Burger King and parked in a nearby parking lot at Graham's direction. Williams got out of the vehicle, stated that he was going to get something to eat, and walked toward the restaurant. A few moments later, Moore heard faint

3

gunshots. Graham jumped out and ran back toward the end of Moore's vehicle. Moore then saw Williams running back to the vehicle. Graham and Williams got in Moore's vehicle, and Moore drove away. Moore returned to the Belmont Apartments to pick up Lewis and his girlfriend. Moore disclaimed any knowledge about the plan to rob Young.

"Law-enforcement officials interviewed Graham, who denied any involvement in or having any knowledge about Young's murder. During the investigation, Graham's mother contacted law enforcement to report that she believed that a gun used in a crime was at her residence. Officers reported to the residence and recovered a black and silver Smith & Wesson brand firearm. When questioned about the firearm, Graham claimed that the firearm belonged to him and that the firearm was not involved in the crime. After several interviews, Graham finally admitted to his role in the murder but contended that Williams was the individual who had shot Young.

"Officers arrested Williams and questioned him about Young's murder. Williams denied any involvement in the murder. His counsel at the time told the investigator that Williams was at home that evening.

"Prior to Williams's trial, Tyus, Graham, and Moore pleaded guilty to felony murder for their involvement in Young's death. As part of its case-in-chief, the State called Tyus and Moore to testify at Williams's trial. Tyus testified that he went with Young to sell a rifle and that in return for the rifle Young received money and a Smith & Wesson .40-caliber firearm. After the exchange, they went to Young's house. Tyus got in his vehicle, and he and Young met in the Burger King parking lot. Tyus testified that he did not like Young's being involved in selling weapons. He explained: '[T]he type of lifestyle that he was trying to live, it wasn't for him. And he wasn't really involved in that type stuff.' (R. 600-01.) Tyus testified that he wanted Young to 'go to school and

4

play baseball.' (R. 601.) Tyus's plan to save his friend from a wayward life was to have Graham rob Young in the Burger King parking lot to get the firearm. Consistent with his prior statement, Tyus testified that he went to the drive-through when Graham arrived at the restaurant with Moore and Williams. According to Tyus, Graham and Williams got out of the vehicle and walked toward the restaurant. Graham stopped, but Williams continued to where Young was parked. Tyus heard gunshots, and Graham and Williams ran back to Moore's vehicle. Graham, who was on the telephone with Tyus, screamed at Williams, telling him that he was only supposed to rob Young, not kill him. Tyus pulled out of the drive-through and drove away.

"Lewis, Graham's girlfriend, testified that on the day of the shooting Moore picked up Graham and her from Graham's mother's house and drove her to the Belmont Apartments complex to visit Moore's girlfriend. Moore and Graham left, and, when they returned later, Williams was with them. Lewis testified that she saw Williams with a gun and money. Moore took Williams home and then took Graham and Lewis back to Graham's mother's house. Graham told her that Williams had shot Young.

"An analysis of Williams's cell-phone records reflected that his cell phone was not at his residence over an hour before the murder. The records also showed that before and after the murder, phone calls went unanswered and, about 30 minutes after the murder, the cell phone was turned off.

"Defense counsel called Graham to testify at trial. Graham at first denied any involvement in the murder and testified that he pleaded guilty to the murder only 'to get back home to [his] family.' (R. 646.) After further questioning, Graham admitted to his role in the murder and identified Williams as the individual who had shot Young. Graham maintained that the firearm recovered at his mother's house was his own firearm and that it was not involved in the crime.

Yet Dickerson testified that the firearm appeared to be the firearm that Young had had in his possession the day of his murder."

Williams v. State, (No. CR-2023-0207, August 23, 2024) ___ So. 3d ___ (Ala. Crim. App. 2024) (table).

Section 12-21-222, Ala. Code 1975, provides:

"A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."

In Williams v. State, 72 So. 3d 721 (Ala. Crim. App. 2010), this Court stated:

"In addressing whether evidence was sufficient to corroborate accomplice testimony in Ex parte McCullough, 21 So. 3d 758 (Ala. 2009), the Alabama Supreme Court stated:

"'In Ex parte Hardley, 766 So. 2d 154 (Ala. 1999), this Court addressed the test for determining the sufficiency of evidence corroborating an accomplice's testimony:

"'"Discussing § 12-21-222, at § 300.01(5), C. Gamble, McElroy's Alabama Evidence (5th ed. 1996), Professor Gamble notes:

"'"'Nonaccomplice evidence of the defendant's guilt, to be sufficient corroboration

6

of the accomplice's testimony to take the case to the jury, must tend to connect the defendant with the crime or point to the defendant, as distinguished from another person, as the perpetrator of the crime. Nonaccomplice evidence which merely confirms the way and manner in which the crime was committed, but which is colorless and neutral insofar as the defendant's connection with the crime is concerned, is not sufficient corroboration to warrant submission of the case to the jury.'"

"'766 So. 2d at 157.

"'This Court has elaborated on this test:

"'"Under § 12-21-222, Ala. Code 1975, a felony conviction 'cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient.' (Emphasis added.) In reviewing a claim of insufficient corroboration, the Alabama appellate courts have stated that

7

"'"'[t]he test for determining whether there is sufficient corroboration of the testimony of an accomplice consists of eliminating the testimony given by the accomplice and examining the remaining evidence to determine if there is sufficient evidence tending to connect the defendant with the commission of the offense.'

"'"Andrews v. State, 370 So. 2d 320, 321 (Ala. Crim. App.), cert denied, 370 So. 2d 323 (Ala. 1979), citing Miller v State, 290 Ala. 248, 275 So. 2d 675 (1973).  The evidence corroborating the accomplice's testimony and connecting the defendant to the offense can be purely circumstantial evidence. Mathis v. State, 414 So. 2d 151 (Ala. Crim. App. 1982).  But, "'[i]t must be of a substantive character, must be inconsistent with the innocence of the accused, and must do more than raise a suspicion of guilt ...." Sorrell v. State, 249 Ala. 292, [293], 31 So. 2d 82, 83 [(1947)].' Ex parte Bell, 475 So. 2d 609, 613 (Ala.), cert. denied, 474 U.S. 1038, 106 S. Ct. 607, 88 L. Ed. 2d 585 (1985)."

"'Ex parte Bullock, 770 So. 2d 1062, 1067 (Ala. 2000).

8

"'Furthermore, in <u>Ex parte Stewart</u>, 900 So. 2d 475 (Ala. 2004), this Court, quoting <u>Ex parte Hunt</u>, 744 So. 2d 851, 858-59 (Ala. 1999), noted:

"""'The Court of Criminal Appeals has ... added the following caveats to the rule [regarding corroboration of accomplice testimony]:

"'"'""The tendency of the corroborative evidence to connect [the] accused with the crime, or with the commission thereof, must be independent, and without the aid of any testimony of the accomplice; the corroborative evidence may not depend for its weight and probative value on the testimony of the accomplice, and <u>it is insufficient if it tends to connect [the] accused with the offense only when given direction or interpreted by, and read in conjunction with the testimony of the accomplice</u>.' 23 C.J.S. Criminal Law, Section 812 (b)(1961)."

"""'<u>Mills v. State</u>, 408 So. 2d [187], 191-92.'

"'"'"'""[E]vidence which merely raises a conjecture, surmise, speculation, or

suspicion that [the] accused is the guilty person is not sufficiently corroborative of the testimony of an accomplice to warrant a conviction." 23 C.J.S. Criminal Law, Section 12(5)(b).' Staton v. State, 397 So. 2d 227, 232 (Ala. Crim. App. 1981)."

"'"'Steele v. State, 512 So. 2d 142, 143-44 (Ala. Crim. App. 1987).'"

"'900 So. 2d at 477-78 (emphasis added).

"21 So. 3d at 761-62."

72 So. 3d at 722-24 (Emphasis added.)

"'The reason for such a rule is obvious. The accomplice knows the details of the crime because he was present and a participant and can recite those details whether or not the accused was a participant in the offense.

"'…"This is why it is incumbent upon the State to present evidence independent of the accomplices' which connects the defendant to the commission of the crime. Else, any guilty party is apt to implicate an innocent party in exchange for a grant of immunity from prosecution."'" Lindhorst v. State, Ala. Cr. App., 346 So. 2d 11, at 15 (1977), cert. denied, Ala. 346 So. 2d 18.

"'Our legislature recognized a fact which has never been recognized in federal law – that a guilty party, when offered immunity from prosecution,

10

will point an accusing finger in any direction to avoid prosecution. The more serious the penalty, the more likely a false accusation will occur. Thus, our legislature, in order to protect the innocent and to preserve the presumption of innocence, has required additional evidence for a conviction in such cases via § 12-21-222, [Ala. Code 1975].'

"Reed v. State, 407 So. 2d 153, 158 (Ala. Crim. App. 1980), reversed on other grounds, 407 So. 2d 162 (Ala. 1981). See Hergott v. State, 639 So. 2d 571, 573 (Ala. Crim. App. 1993) ('The purpose of § 12-21-222 was to ensure that the testimony of a guilty party testifying in return for leniency from the state would not alone be sufficient to convict another. An accomplice's testimony must be corroborated before a conviction of felony could be had.')."

Jackson v. State, 98 So. 3d 35, 39-40 (Ala. Crim. App. 2012) (holding that the evidence was not sufficiently corroborative of accomplice testimony to support a conviction for felony murder).

"'Whether such corroborative evidence exists is a question of law to be resolved by the trial court, its probative force and sufficiency being questions for the jury.'" Green v. State, 61 So. 3d 386, 393 (Ala. Crim. App. 2010) (quoting Caldwell v. State, 418 So. 2d 168, 170 (Ala. Crim. App. 1981)) (citations omitted).

Williams's accomplices – Graham, Tyus, and Moore – provided testimony devastating to Williams. The State, though, bore the burden of corroborating that testimony. To determine whether the State met its

11

burden, this Court must first subtract the evidence based on statements made by the accomplices. See McCoy v. State, 397 So. 2d 577, 585 (Ala. Crim. App. 1981). Doing so leaves this Court with little evidence even referencing Williams. None of the eyewitnesses identified Williams, and Williams could not be identified on the video-surveillance footage. Det. Reginald K. Dabney offered ample evidence implicating Williams; yet all this evidence was supplied by Williams's alleged accomplices.

The majority in its memorandum references several items of evidence that it says sufficiently corroborate the accomplices' testimony. First, the majority points to the testimony of Graham's girlfriend, Carianna Lewis. Lewis testified that on the day of the shooting Moore picked up Graham and her from Graham's mother's house and drove them to the Belmont Apartments complex to visit Moore's girlfriend. Moore and Graham left, and, when they returned later, Williams was with them. Lewis testified that she saw Williams in possession of a gun and money. Moore took Williams home and then took Graham and Lewis back to Graham's mother's house. Graham told her that Williams had shot Young.

Indeed, Lewis was not an accomplice and was able to testify about a portion of Williams's activities on the night Young was killed. However, without the accomplices' testimony, Lewis's testimony does no more than place Williams with the accomplices at some point during the night <u>after</u> the crime. The fact that Williams was with the accomplices after the murder, even in possession of a firearm and money, without more, does not connect Williams to the offense and does no more than possibly "raise a suspicion of [Williams's] guilt." <u>Ex parte Bullock</u>, 770 So. 2d 1062, 1067 (Ala. 2000). <u>See</u> <u>Lang v. State</u>, 359 So. 3d 283 (Ala. Crim. App. 2020) (holding that evidence was insufficient to support conviction for solicitation to commit murder because there was no corroborating evidence of the testimony of the alleged solicitee necessary to establish criminal solicitation); <u>Green v. State</u>, <u>supra</u> (holding that evidence was insufficient to corroborate accomplice testimony that defendant participated in arson of a barn). Lewis's testimony that Graham told her Williams shot Young is plainly based on the statement of an accomplice.

Next, the majority in its memorandum references testimony regarding officers recovering from the residence of Graham's mother the weapon that Young obtained during a gun deal shortly before the murder.

13

The testimony was conflicting as to whether this was the same pistol for which Young had traded, but, even if it were the same pistol, this evidence implicates Graham, not Williams.

The majority also concludes that Det. Dabney's testimony provided evidence corroborating the accomplices' testimony, stating:

> "Det. Dabney also testified about the 'red flags' that came up during Williams's interview. For example, Williams immediately tried to distance himself from the accomplices before Det. Dabney started the questioning, and, although Det. Dabney told him only the date but not the time the murder occurred, Williams told him he had been home when the murder occurred. (R. 353-56.) Despite Williams's statement that he was at home when the murder occurred, an analysis of Williams's cell-phone records showed that his cell phone was not at his home over an hour before the murder, and the records also showed that before and after the murder, phone calls went unanswered and that, about 30 minutes after the murder, the phone was turned off."

I do not agree that this testimony serves as corroboration of accomplice testimony. Williams's cell-phone records, at most, show that, over an hour before the murder, Williams's cell phone connected to a tower that indicated that Williams's cell phone was not at Williams's residence at the time. Dabney's testimony that Williams was involved in Young's murder is merely conjecture or suspicion, which is insufficient to support a conviction.

14

To the extent that the memorandum relies on Graham's testimony as corroboration because he was called as a witness for the defense, it does so in error. "When reviewing a motion for judgment of acquittal, we can consider only that evidence before the court at the time the motion was made. Burrell v. State, 680 So. 2d 975 (Ala. Cr. App. 1996). We cannot consider the evidence presented by the appellant in his case-in-chief … when reviewing the motion for a judgment of acquittal." Henderson v. State, 715 So. 2d 863, 866 (Ala. Crim. App. 1997).

In short, excluding the testimony of the accomplices, the State failed to present "'any incriminating evidence tending to connect [Williams] with the commission of [Young's murder].'" Ex parte Bullock 770 So. 3d 1062, 1067 (Ala. 2000) (quoting Andrews v. State, 370 So. 2d 320, 321 (Ala. Crim. App.), cert denied, 370 So. 2d 323 (Ala. 1979)). Therefore, the State failed to present sufficient evidence to sustain Williams's convictions for Young's murder.

I believe that the circuit court erred in denying Williams's motion for a judgment of acquittal made at the close of the State's case-in-chief and that his convictions for capital murder are due to be reversed. Therefore, I respectfully dissent.