Rel: January 17, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2024-2025

_____

## CR-2023-0826

_____

## Corey Ramon Davis

## v.

## State of Alabama

## Appeal from Marengo Circuit Court
## (CC-09-102)

MINOR, Judge.

AFFIRMED BY UNPUBLISHED MEMORANDUM.

McCool and Cole, JJ., concur in the result. Windom, P.J., dissents, with opinion. Kellum, J., dissents.

WINDOM, Presiding Judge, dissenting.

Corey Ramon Davis appeals from his convictions for one count of capital murder, see § 13A-5-40(a)(10), Ala. Code 1975, and one count of conspiracy to commit murder, see §§ 13A-4-3 and 13A-6-2, Ala. Code 1975, and his resulting concurrent sentences to life in prison without the possibility of parole and to 10 years in prison, respectively. This Court, in an unpublished memorandum, affirms Davis's convictions and sentences. I respectfully dissent.

## I.

Davis argues on appeal, as he did at the close of the State's case-in-chief, that there was no evidence presented to corroborate the testimony of his alleged accomplices – Jeremy Bell and Carl Perry. The unpublished memorandum summarizes the evidence as follows:

> "In November 2008, Georgetta Essex pulled up to her sister's house on East Decatur Street in Demopolis. Essex's boyfriend Ron Elmore and Essex's sister's boyfriend Ben Green were both standing in the yard. After Elmore walked up to the car, Essex heard a loud 'boom.' (R. 330.) Essex then saw Elmore and Green lying on the ground with fatal gunshot wounds.[1]

> "Detective Tim Soronen, who ha[s] since retired from the Demopolis Police Department, responded, after receiving a call around 5:00 p.m. on November 13 about someone being shot on East Decatur Street, and saw two men lying in the

driveway and Essex nearby in her car.[2] Detective Soronen could tell that Elmore was dead with a gunshot wound to his head, but he called an ambulance for Green, who was still breathing. [Detective] Soronen found on the ground near the bodies bullet fragments the size of which he believed to be 'of a 12-gauge[,] double-aught buckshot.' (R. 428.) He also found a 'small amount' of marijuana near Elmore's body and a marijuana 'blunt' in the mailbox in front of the house. (R. 432.) Detective Soronen testified that based on where the two men were standing and that they were both struck on the right side of their bodies 'kind of from the back to the front,' he determined that both men were hit by one shotgun blast fired from a wooded area across the road. (R. 437.)

"After initial interviews on the evening of the shooting, Detective Soronen tried to locate Davis, who earlier had been at Ruthie Mae Williams's house next door to the crime scene, because he learned that there had been a 'possible rift' between Davis and the two men, but Detective Soronen could not find Davis. (R. 439.) But the next day Davis went to the police station and gave a Mirandized[3] statement to police. Davis confirmed the 'beef,' stating that he believed that Green had stolen about $800 or $900 from him at the Oak Tree Lounge. (R. 443.) Detective Soronen testified that Davis admitted that on the day of the shootings, he and Green had had some 'exchanges.' (R. 444.)

"Agent Leslie Hines, a certified firearms instructor, testified that based on where the bodies of Elmore and Green had fallen and the pellet impacts on the home, she opined that the shooter would have been 'directly across the street in the wooded area between the railroad tracks and East Decatur Street.' (R. 481.) She opined that the distance of the shooter would have been at least 25 to 35 yards. Agent Hines examined the 12-gauge shotgun seized as the weapon used during the shooting and the projectiles recovered from the bodies and determined that both men were killed by buckshot. Agent Hines explained that there are eight to nine projectiles

3

within a single buckshot shell. She also explained that the location of Green's injuries showed a 'torso up' aiming point. (R. 498.)

"Chylon Spencer, an acquaintance of Davis, testified that on the day of the shooting, he and Davis were at Ruthie Mae Williams's house next door to the crime scene when Green walked up and said that 'he heard some threats supposed to be going on about an altercation [Davis and Green] had.' (R. 549.)  He also testified that around 6:00 p.m. and 7:00 p.m. on the night of the shooting, Spencer, who at the time was in Eutaw, Alabama, called Davis's cellphone and that [Jeremy] Bell answered Davis's phone and said, 'He's busy.' (R. 557-58.) Spencer testified that later that night when he returned home and was with Davis, he overheard Davis on the phone asking, 'about where a gun was.' (R. 561.)

"Jeremy Bell, Davis's cousin, testified that he was currently incarcerated for the murders of Elmore and Green. Bell testified that on the day of the shooting, Davis and his friend Carl Perry were looking for him because they wanted to talk about needing a gun or ammunition. Bell testified that Davis told him to shoot Elmore and Green and that Perry told him where to stand—about 45 yards away. Bell testified that he fired one shot with a .410 shotgun loaded with what he believed was bird shot.[4]  Bell explained that he had no reason to kill Elmore or Green and that he did not mean for them to die. Bell testified that 'Davis told [him] to shoot them waist down. [Davis] never said kill them.' (R. 506.) Bell testified that after the shooting, he ran down the train tracks and hid the shotgun.

"Carl Perry testified that he pleaded guilty to conspiracy to commit the murder of Elmore and Green and read his allocution made during the guilty plea. Perry admitted that he had loaned his shotgun to Davis, who had Bell with him, and that he knew that Davis planned to use it against Green. Perry testified that Davis stated that he had had an

4

altercation with Green and that Davis wanted to get back at Green, '[Davis] wanted to sting [Green] on [Green's] behind.' (R. 586.) Perry denied that he loaded the shotgun before Bell got it from Davis. But Perry admitted that on the morning after the shooting, he helped Davis and Bell find the shotgun and that Perry threw the shotgun near a creek where it was recovered by police.

"Officer Tommie Reese with the Marengo County Sheriff's Department took Davis's statement, in which Davis admitted that he and Green had fought over money that Green supposedly had stolen from him at the Oak Tree Lounge but denied that he had had any 'words' with him since. (R. 664.) He also admitted that at the time of the shooting, he and Perry were at Ruthie Mae Williams's house and that afterward he and Perry left and rode around for a while.

"_____

"[1]Dr. Edward Reedy employed with the Alabama Department of Forensic Sciences testified that Elmore died from a shotgun wound to the head and that Green died from shotgun wounds to his neck and abdomen. Dr. Reedy testified that the shotgun blasts were fired from a distant range and that the circumstances of death were consistent with homicide.

"[2][Detective] Soronen testified that he searched Essex's car and that he did not find any weapons or spent casings. Essex was ultimately excluded as the shooter.

"[3]Miranda v. Arizona, 384 U.S. 436 (1966).

"[4]Bell said that Perry had switched the birdshot with the 'slug shot' and that he and Davis got into a fight about it afterward. (R. 506.) But that testimony was impeached by Officer [Tommie] Reese, who testified that Bell said that

Davis had come to his house on the morning of the shooting and asked him for buckshot. (R. 647.)"

Section 12-21-222, Ala. Code 1975, provides:

"A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."

In Williams v. State, 72 So. 3d 721 (Ala. Crim. App. 2010), this

Court stated:

"In addressing whether evidence was sufficient to corroborate accomplice testimony in Ex parte McCullough, 21 So. 3d 758 (Ala. 2009), the Alabama Supreme Court stated:

"'In Ex parte Hardley, 766 So. 2d 154 (Ala. 1999), this Court addressed the test for determining the sufficiency of evidence corroborating an accomplice's testimony:

"'"Discussing § 12-21-222, at § 300.01(5), C. Gamble, McElroy's Alabama Evidence (5th ed. 1996), Professor Gamble notes:

"'"'Nonaccomplice evidence of the defendant's guilt, to be sufficient corroboration of the accomplice's testimony to take the case to the jury, must tend to connect the defendant with the crime or point to the defendant, as distinguished from another

6

person, as the perpetrator of the crime. Nonaccomplice evidence which merely confirms the way and manner in which the crime was committed, but which is colorless and neutral insofar as the defendant's connection with the crime is concerned, is not sufficient corroboration to warrant submission of the case to the jury.'"

"'766 So. 2d at 157.

"'This Court has elaborated on this test:

"'"Under § 12-21-222, Ala. Code 1975, a felony conviction 'cannot be had on the testimony of an accomplice <u>unless corroborated by other evidence tending to connect the defendant with the commission of the offense</u>, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient.' (Emphasis added.) In reviewing a claim of insufficient corroboration, the Alabama appellate courts have stated that

"'"'[t]he test for determining whether there is sufficient corroboration of the testimony of an accomplice consists of eliminating the testimony given by the accomplice and examining the remaining

7

evidence to determine if there is sufficient evidence tending to connect the defendant with the commission of the offense.'

"'"Andrews v. State, 370 So. 2d 320, 321 (Ala. Crim. App.), cert denied, 370 So. 2d 323 (Ala. 1979), citing Miller v. State, 290 Ala. 248, 275 So. 2d 675 (1973). The evidence corroborating the accomplice's testimony and connecting the defendant to the offense can be purely circumstantial evidence. Mathis v. State, 414 So. 2d 151 (Ala. Crim. App. 1982). But, '"[i]t must be of a substantive character, must be inconsistent with the innocence of the accused, and must do more than raise a suspicion of guilt ...." Sorrell v. State, 249 Ala. 292, [293], 31 So. 2d 82, 83 [(1947)].' Ex parte Bell, 475 So. 2d 609, 613 (Ala.), cert. denied, 474 U.S. 1038, 106 S. Ct. 607, 88 L. Ed. 2d 585 (1985)."

"'Ex parte Bullock, 770 So. 2d 1062, 1067 (Ala. 2000).

"'Furthermore, in Ex parte Stewart, 900 So. 2d 475 (Ala. 2004), this Court, quoting Ex parte Hunt, 744 So. 2d 851, 858-59 (Ala. 1999), noted:

"'"'The Court of Criminal Appeals has ... added the following caveats to the rule [regarding corroboration of accomplice testimony]:

8

"'"'""'The tendency of the corroborative evidence to connect [the] accused with the crime, or with the commission thereof, must be independent, and without the aid of any testimony of the accomplice; the corroborative evidence may not depend for its weight and probative value on the testimony of the accomplice, and <u>it is insufficient if it tends to connect [the] accused with the offense only when given direction or interpreted by, and read in conjunction with the testimony of the accomplice</u>.' 23 C.J.S. Criminal Law, Section 812 (b)(1961)."

"'"'<u>Mills v. State</u>, 408 So. 2d [187], 191- 92 [(Ala. Crim. App. 1981)].'

"'"'"'"[E]vidence which <u>merely raises a conjecture, surmise, speculation, or suspicion that [the] accused is the guilty person is not sufficiently corroborative of the testimony of an accomplice to warrant a</u>

9

conviction." 23 C.J.S. Criminal Law, Section 12(5)(b).' Staton v. State, 397 So. 2d 227, 232 (Ala. Crim. App. 1981)."

"'"'Steele v. State, 512 So. 2d 142, 143-44 (Ala. Crim. App. 1987).'"

"'900 So. 2d at 477-78 (emphasis added).'

"[Ex parte McCullough,] 21 So. 3d [758,] 761-62 [(Ala. 2009)]."

72 So. 3d at 722-24 (second emphasis added).

"'The reason for such a rule is obvious. The accomplice knows the details of the crime because he was present and a participant and can recite those details whether or not the accused was a participant in the offense.

"'… "This is why it is incumbent upon the State to present evidence independent of the accomplices' which connects the defendant to the commission of the crime. Else, any guilty party is apt to implicate an innocent party in exchange for a grant of immunity from prosecution." Lindhorst v. State, Ala. Cr. App., 346 So. 2d 11, at 15 (1977), cert. denied, Ala. 346 So. 2d 18.

"'Our legislature recognized a fact which has never been recognized in federal law – that a guilty party, when offered immunity from prosecution, will point an accusing finger in any direction to avoid prosecution. The more serious the penalty, the more likely a false accusation will occur. Thus, our legislature, in order to protect the innocent

10

and to preserve the presumption of innocence, has required additional evidence for a conviction in such cases via § 12-21-222, [Ala. Code 1975].'

"Reed v. State, 407 So. 2d 153, 158 (Ala. Crim. App. 1980), reversed on other grounds, 407 So. 2d 162 (Ala. 1981). See Hergott v. State, 639 So. 2d 571, 573 (Ala. Crim. App. 1993) ('The purpose of § 12-21-222 was to ensure that the testimony of a guilty party testifying in return for leniency from the state would not alone be sufficient to convict another. An accomplice's testimony must be corroborated before a conviction of felony could be had.')."

Jackson v. State, 98 So. 3d 35, 39-40 (Ala. Crim. App. 2012) (holding that the evidence was not sufficiently corroborative of accomplice testimony to support a conviction for felony murder).

"'Whether such corroborative evidence exists is a question of law to be resolved by the trial court, its probative force and sufficiency being questions for the jury.'" Green v. State, 61 So. 3d 386, 393 (Ala. Crim. App. 2010) (quoting Caldwell v. State, 418 So. 2d 168, 170 (Ala. Crim. App. 1981)).

Davis's accomplices, Bell and Perry, provided testimony implicating Davis. The State, however, bore the burden of corroborating that testimony. To determine whether the State met its burden, this Court must first subtract the evidence based on statements made by the accomplices. See McCoy v. State, 397 So. 2d 577, 585 (Ala. Crim. App.

11

1981).  Doing so leaves this Court with simply no corroborative evidence.  Except for the accomplices' testimony, no evidence, either direct or circumstantial, exists to sufficiently link Davis with the murders.

The unpublished memorandum references several items of evidence that it says sufficiently corroborate the accomplices' testimony.  First, the memorandum points to a possible motive – a "beef" between Davis and Green that arose because Davis suspected Green of stealing money from him – and asserts that this issue was "revisited on the day of the shooting."  Indeed, Davis himself admitted that, several weeks before the shooting he and Green had fought over stolen money, though he told investigators that it was no longer an issue.  (R. 444.)  Chylon Spencer offered testimony about the "exchanges" referenced by the memorandum.  Specifically, Spencer testified that he had met Davis on the morning of the shooting to go fishing and that, while the men stood in the road, Green had approached them and asked about any threats:

> "[Green] walked up trying to see like – say he heard some threats or whatever.  I don't know if he was pointing at me and [Davis] or [Davis].  But, you know, I got in my truck, and [Davis] brushed it off or whatever.  But he was like he heard some threats supposed to be going on about an altercation they had."

(R. 549.) Spencer testified that Davis "was like, [g]o on with that mess … like wasn't nobody making no threats." (R. 550.)

Neither Spencer nor Davis indicated that any threats were actually made on the day of the shooting or that any "beef" Davis may have had with Green was an ongoing issue. In fact, Spencer testified that it was Green who had asked about possible threats and that Davis had dismissed the notion. Regardless, "[p]roof of a defendant's motive, alone, is not sufficient to corroborate an accomplice's testimony and to connect the defendant to the crime." Ex parte Bullock, 770 So. 2d 1062, 1067 (Ala. 2000). Motive does nothing more than raise a suspicion of guilt and does not connect the defendant with the commission of the offense. Thus, this evidence is not sufficient corroboration of accomplice testimony.

Next, the memorandum references Davis's being with the accomplices during and after the shooting. It was Davis who placed himself with Perry, telling investigators that he was with Perry at the time of the shooting at "Ruthie Mae Williams's house and that afterward he and Perry left and rode around for a while." The memorandum asserts that Spencer placed Davis with Bell by testifying that when he had called Davis's cell phone around 6:00 p.m. and 7:00 p.m. on the night of the

13

shooting, Bell had answered and told Spencer: "He's busy." (R. 557-58.) When asked at trial if he had seen Bell on the night of the shooting, Spencer testified: "No, I did not. I <u>think</u> I spoke to [Bell] on the phone when I called [Davis]'s phone one time. He answered, and he say [Davis] was busy. That's it." (R. 557) (emphasis added). Contrary to the memorandum's assertion, Spencer was not sure that it was Bell who answered Davis's phone. However, even if it was Bell who had answered Davis's phone the night of the shooting, that fact does nothing more than show that either Bell had Davis's phone or that Bell and Davis were together approximately an hour or two after the shooting; neither scenario connects Davis to the commission of the offenses.

The fact that an accused and an alleged accomplice were together at or about the time of the commission of an offense does not by itself tend to connect the accused with the commission of the offense; rather, it is their association at or near the place where the crime was committed that <u>may, in conjunction with other facts and circumstances</u>, sufficiently tend to connect the accused with the commission of the offense so as to furnish the necessary corroboration. <u>Kimmons v. State</u>, 343 So. 2d 542 (Ala. Crim. App. 1977). "Additional facts and circumstances, however slight,

14

must be adduced to support the testimony of the accomplice in addition to or in conjunction with those of proximity, chronologically and graphically, to the alleged offense in the association of an accomplice." Id. at 547. See also Caldwell v. State, 418 So. 2d 168 (Ala. Crim. App. 1981); Goodwin v. State, 644 So. 2d 1269 (Ala. Crim. App 1993).

The memorandum cites Cheatham v. State, 104 Nev. 500, 505, 761 P.2d 419 (1988), to support its contention that these associations between Davis and his alleged accomplices sufficiently tends to connect Davis with the commission of the offenses and furnishes the necessary corroboration. The facts in this case are clearly distinguishable from those in Cheatham. Kenneth Cheatham was convicted of robbing and murdering a drug dealer in a hotel room in Reno, Nevada. Cheatham's conviction was obtained largely on the strength of testimony from his accomplices – Jean McKinnis, Clinton Long, and Melvin Howard. On appeal, Cheatham challenged the sufficiency of the evidence, arguing that the State had failed to corroborate his accomplices' testimony. The Supreme Court of Nevada recognized the well-settled principle that "[a]n accomplice's testimony is not sufficiently corroborated merely by showing that the defendant was near the scene of the crime at the time the

15

accomplice testified that they committed the crime in concert." Cheatham, 104 Nev. at 505, 761 P.2d at 422. Nevertheless, the Court affirmed Cheatham's conviction and sentence, holding that "we have evidence of more than mere presence at the time and place that the accomplices say the crime was committed. We have instead a chain of events showing the constant association of Cheatham and the accomplices throughout the day that the crime was committed," id, namely:

> "Cheatham testified that he traveled to Reno from San Jose in a car with accomplices Long and Howard. He testified further that he was present with accomplices McKinnis, Long and Howard in McKinnis's hotel room, the place where the robbery and murder were committed, immediately prior to the commission of the crime. Cheatham also testified that he was with accomplices McKinnis, Long and Howard after the robbery and murder were committed. Finally, we learn from Cheatham that he had planned to hitchhike to Reno – presumably because he had no money to travel by other means – but was able to afford to check into a motel room after the robbery."

Id.

In short, the State of Nevada presented evidence of "a fairly constant association and companionship" between Cheatham and his accomplices, including their being together at the location of the crime, and showed that Cheatham was in possession of apparent proceeds of the

16

offense.[1]  Id.  Davis's being with Perry when the crime occurred at some other location and his being in Perry's and Bell's presence at some indeterminate time after the shooting simply do not compare to the connections established in Cheatham.

Finally, the memorandum turns to Spencer's testimony that, on the night of the shooting, he overheard Davis on the phone asking "about where a gun was."  Spencer testified that he was with Davis and Perry after the shooting and that Davis received numerous phone calls from people asking about the shooting.  The prosecutor asked Spencer if he had heard Davis "in any of these conversations that he was having asking about where a gun was."  (R. 561.)  Spencer testified: "On the way to

---

[1]Although this corroborative evidence seems compelling to me, the Supreme Court of Nevada allowed that it still might not be legally sufficient to sustain Cheatham's conviction, stating:

"Were the foregoing insufficient by way of corroborating evidence, its insufficiency would be remedied by McKinnis's statement to Long in the Santa Clara jail. 'Did they get Cheats?' One certainly could infer from this unguarded, thought-to-be-confidential statement by McKinnis that McKinnis expected the police to apprehend Cheatham because Cheatham had participated in the robbery and murder of Arritt."

Cheatham, 104 Nev. at 505-06, 761 P.2d at 423.

Jefferson, it was – it did come up, yes." (R. 561.) This testimony, without any context, is insufficient to connect Davis to the offenses. Further, even if this testimony tended to connect Davis to the offenses, it would "connect [Davis] to the offense[s] [only] when given direction or interpretation by, and read in conjunction with, the testimony of the accomplices." Williams, 72 So. 3d at 724. Thus, this testimony alone does not provide the necessary corroboration.

In sum, excluding the testimony of the alleged accomplices, the State failed to present "'any incriminating evidence tending to connect [Davis] with the commission of [the murders].'" Ex parte Bullock 770 So. 3d 1062, 1067 (Ala. 2000) (quoting Andrews v. State, 370 So. 2d 320, 321 (Ala. Crim. App.), cert denied, 370 So. 2d 323 (Ala. 1979)). Therefore, I would hold that the State failed to present sufficient evidence to sustain Davis's convictions for capital murder and conspiracy to commit murder, and I believe that the circuit court erred in denying Davis's motions for a judgment of acquittal.

## II.

Even if I were to find that the State had presented sufficient evidence to corroborate the alleged accomplices' testimony, I would still

not concur in the unpublished memorandum because I believe Davis's convictions violate double-jeopardy principles. With regard to double jeopardy, this Court has explained:

"The Supreme Court of the United States has held that the Double Jeopardy Clause of the Fifth Amendment contains three protections: 'It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.' North Carolina v. Pearce, 395 U.S. 711, 717 (1969) (footnotes omitted), overruled on other grounds, Alabama v. Smith, 490 U.S. 794 (1989). See Schiro v. Farley, 510 U.S. 222, 229 (1994) (reaffirming the three protections of the Double Jeopardy Clause). 'These Protections stem from the underlying premise that a defendant should not be twice tried or punished for the same offense.' Schiro, 510 U.S. at 229 (citing United States v. Wilson, 420 U.S. 332, 339 (1975). The Alabama Supreme Court has held that the Double Jeopardy Clause of Art. I § 9, of the Alabama Constitution of 1901, applies to protect only those three areas enumerated in Pearce. See Ex parte Wright, 477 So. 2d 492, 493 (Ala. 1985); Adams v. State, 955 So. 2d 1037, 1098 (Ala. Crim. App. 2003), reversed on other grounds, Ex parte Adams, 955 So. 2d 1106 (Ala. 2005) (holding that Adams, who was 17 years old at the time of the offense, is not eligible for a sentence of death).

"In Blockburger v. United States, the Supreme Court of the United States enumerated the 'same elements' test for determining whether two charges constitute the same offense in violation of the Double Jeopardy Clause of the Fifth Amendment. 284 U.S. 299, 304 (1932). Under the Blockburger test, 'where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses

19

or only one is whether each provision requires proof of a fact which the other does not.' Id. (emphasis added)."

Gholston v. State, 57 So. 3d 178, 184 (Ala. Crim. App. 2010).

I believe Davis's convictions violate the third protection enumerated in North Carolina v. Pearce, 395 U.S. 711, 717 (1969) – multiple punishments for the same offense.[2] This Court's holding in Miller v. State, 264 So. 3d 907 (Ala. Crim. App. 2017), illustrates the point.

Miller was convicted of first-degree robbery and conspiracy to commit first-degree robbery based on a robbery of the Courtyard Marriott Hotel in Gulf Shores. This Court held that Miller's convictions did not violate the test set forth in Blockburger v. United States, 284 U.S. 299 (1932), because the elements of each offense were separate and distinct and each offense required proof of a factual element that the other did not. Miller, 264 So. 3d at 914. Despite that holding, this Court, relying on § 13A-1-8(b)(2), Ala. Code 1975, held that Miller's convictions nevertheless violated double-jeopardy principles because the Legislature

---

[2]Although neither party raises this issue, I believe, based on Davis's being punished twice for the same act, that it is a jurisdictional issue that must be noticed. See Ex parte Benefield, 932 So. 2d 92, 93-94 (Ala. 2005).

had intended that defendants should not be convicted and punished separately for the two offenses. Id.

Section 13A-1-8(b)(2) provides:

"(b) When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense. He may not, however, be convicted of more than one offense if:

"....

"(2) One offense consists of only a conspiracy or other form of preparation to commit the other."

Returning to Miller, this Court held:

"Miller's conviction for first-degree robbery was obtained based on the theory that he aided and abetted his co-conspirator, [Joshua] Thomas, in the commission of the offense. Specifically, the State presented evidence indicating that Miller was the one who suggested to Thomas that Thomas take Miller's pistol and rob the Marriott. Miller helped Thomas get dressed for the robbery, gave Thomas the pistol, and drove him to the scene of the incident. Before Thomas robbed the Marriott, Miller took Thomas and showed Thomas the layout of the Marriott, the entrance and route to use during the robbery, and where Miller would be waiting in the getaway car when Thomas was done. Miller told Thomas the security code to use to enter the Marriott through the employee-only entrance, which Miller obtained through his past employment with the Marriott. After Thomas completed the robbery as planned, Miller drove Thomas home. Based on the particular facts of this case, the same conduct used to prove that Miller aided and abetted Thomas in committing first-degree robbery was used to prove that Miller conspired with Thomas to commit first-degree robbery. Therefore,

21

because one of Miller's convictions consisted of only a conspiracy to commit the other, i.e., first-degree robbery, which the Legislature clearly intended to prohibit in § 13A-1-8(b)(2), Ala. Code 1975, Miller's convictions for both first-degree robbery and the conspiracy to commit first-degree robbery are improper."

Miller, 264 So. 3d at 915-16.

Here, the State presented evidence indicating that Davis was the one who recruited Bell to shoot Green and that he provided Bell with the shotgun Perry had loaned him. Thus, as in Miller, the same "conduct used to prove that [Davis] aided and abetted [Perry and Bell] in committing [capital murder] was used to prove that [Davis] conspired with [Perry and Bell] to commit [murder]." Id. at 916. Indeed, under the facts of this case, proof of the conspiracy was essential to Davis's conviction as an accomplice to murder. Because one of Davis's convictions consisted of only a conspiracy to commit the other, which the Legislature clearly intended to prohibit, see § 13A-1-8(b)(2), Davis's convictions for both capital murder and conspiracy to commit murder are improper. Consequently, even if I agreed with the memorandum's holding that the accomplices' testimony was sufficiently corroborated, I would remand this case to the circuit court for that court to set aside Davis's conviction for conspiracy.

22

Therefore, I respectfully dissent.